Edwin SLADE, Plaintiff,

v.

The UNITED STATES OF MEXICO, Defendant.

Civ. A. No. 84–1343.

United States District Court, District of Columbia.

July 8, 1985.

Edwin Slade, pro se.

Adlai S. Hardin, Jr., Milbank, Tweed, Hadley & McCloy, New York City, Eric L. Richard, Carol A. Corcoran, Washington, D.C., for defendant The United States of Mexico.

MEMORANDUM ORDER

HAROLD H. GREENE, District Judge.

Plaintiff, *pro se,* filed this action against the United States of Mexico to recover $472,123, the purported face value of certain "Receipts for Interest in Arrears" which he alleges were issued by the Mexican government pursuant to certain agreements made in 1922.[1]  This action was originally filed in the United States District

---

1. Plaintiff himself purchased these receipts in  1972.

Court for the District of Nevada.[2] On October 28, 1981, that court dismissed plaintiff's complaint for lack of personal jurisdiction over the defendant. Plaintiff appealed and the Ninth Circuit, in an unpublished opinion, 730 F.2d 769, affirmed the court's finding that it lacked personal jurisdiction, but it nevertheless vacated the lower court's order of dismissal with instructions to transfer the matter pursuant to 28 U.S.C. § 1406(a).[3] In accordance with plaintiff's request, the District Court in Nevada transferred the action to this Court on April 30, 1984. Currently pending are the parties' cross-motions for summary judgment.[4]

In order to understand better the jurisdictional issues raised by Mexico, the background of the agreements under which plaintiff's receipts were issued and the amendments to those agreements will be summarized.

## I

From 1886 to 1910, during the so-called "Diaz regime," Mexico was engaged in extensive construction projects. In order to finance such projects, the government of Mexico as well as certain municipalities and privately-owned railroads issued bonds and various other debt instruments totalling over $500 million. These bonds were sold world-wide by banking houses in the United States and Europe. The government of Mexico continued to make payments on these debts until 1914, when civil unrest broke out in that country.

After the Mexican government ceased making payments, a number of banking houses, many of which had sold bonds to the public, joined together and formed a committee—i.e., the International Committee of Bankers (the Committee)—to negotiate with the Mexican government for the resumption of payment on the bonds.[5] After several years of negotiation, an agreement was finally reached between the Finance Minister of Mexico and the Committee.[6] This agreement, the "Plan and Agreement of June 16, 1922," was intended to restore certain specified obligations, both private and public, and to provide for the discharge of such obligations on a limited and deferred basis by the Mexican government in accordance with its ability to pay.

Among other things, the Plan provided that,

### 1. ARREARS OF INTEREST

The payment in cash of all interest due and payable on or before January 2, 1923, on both the Government and the railway obligations, is to be waived by the bondholders.

The payment of interest upon all arrears of interest due and payable on or before January 2, 1923, on both the government and railway obligations is to be waived by the bondholders.

Notwithstanding these provisions, the Plan provided that the government of Mexico would set aside during a 40 year period—i.e., from 1928 to 1968—sums sufficient to retire the unpaid interest. Holders of coupons for such unpaid interest were required to deposit their coupons with a trustee designated by the Committee who, in exchange for the coupons, would issue receipts for the face amount of the coupons—the same "Receipts for Interest in Arrears" upon which plaintiff sues. In accordance with the Plan, the receipts were

---

**2.** *Edwin Slade v. United States of Mexico,* CIV–LV–80–44, HEV, filed on February 13, 1980.

**3.** The Ninth Circuit stated that "if such jurisdiction exists at all, it would seem to be only in New York, or less probably, in the District of Columbia pursuant to 28 U.S.C. § 1391(f)(1)–(4)." Opinion at 3.

**4.** The motion filed by plaintiff merely states that he is moving for summary judgment "based on the record now before the Court."

**5.** Although the Committee was formed for the purpose of protecting the interests of the bondholders, neither the bondholders nor the government of Mexico authorized the formation of the Committee. Rather, it was a self-constituted and self-appointed entity.

**6.** This agreement was subsequently ratified by the President and Congress of Mexico.

to be issued not by the government of Mexico, but by the Committee. The Plan provided, however, that if the Plan was not, for any reason, fully carried out during the next five years, the bondholders would "resume all their contractual rights."

Upon adoption of this Plan, the Committee drafted a second agreement—the Deposit Agreement of July 1, 1922. This agreement set forth the rights of the holders of coupons for interest in arrears who deposited their coupons with the Committee. By its terms, the Deposit Agreement was "between such holders of the bonds ... and of the coupons or other evidences of indebtedness for or rights to unpaid interest ... as shall become parties to this agreement in the manner herein after provided ... and International Committee of Bankers of Mexico...." The Deposit Agreement also stated that, in the event that the Mexican government defaulted, the holders could recover their deposited coupons or the assignment of rights to interest represented by the receipts from Guaranty Trust Company of New York. Approximately 98% of all the creditors holding bonds and interest coupons covered by the Plan deposited them with the Committee.

Because of continued civil unrest and economic troubles in Mexico, the Mexican government was unable to carry out the 1922 Plan as it had agreed. The Committee and the Finance Minister for Mexico again entered into negotiations and on October 23, 1925 agreed to a supplemental or modified plan—the "1925 Modification."[7] One of the purposes of the 1925 Modification was to limit the Government's liability, obliging it to repay only those amounts it could realistically afford. The 1925 Modification differed from the 1922 Agreement in that it distinguished the direct debts of the central government and political subdivisions, on the one hand, from the debts of the railways on the other. With respect to interest on arrears, the 1925 Modification provided that the government would discharge the direct debt and the railways would discharge their own debt.[8]

Between 1923 and 1928, the Mexican government and the railways paid the Committee in excess of $45 million to purchase and redeem the outstanding debts covered by the 1922 Plan and 1925 Modification. In 1928, however, the Mexican government again ceased making payments because of the social and economic conditions in the country. Although the Committee tried to work out another agreement with the Mexican government, it was unable to do so. In 1932, the Committee abandoned negotiations with the intention of distributing the remaining funds it held.

Ten years later, the Mexican government entered into a third agreement with the Committee—the 1942 Agreement. Under this Agreement, the holders of Receipts for Interest in Arrears could receive payments, which had ceased in 1928, directly from the government of Mexico, but such payments would be at less than face value. Before such holders were eligible to receive any payments, however, they had to assign their proportionate interest in the remaining funds held by the Committee to the Mexican government. In 1946, the Mexican government and the Committee entered into a similar agreement with respect to the repayment of railway obligations.

An additional prerequisite to receive payments under either the 1942 or 1946 agreements, was registration of the instruments (including the Receipts for Interest in Arrears), pursuant to the August 4, 1942 decree of the Mexican government. This decree required all holders of obligations of the Mexican government and the National railways which were issued under the Deposit Agreement of 1922 to register their securities with the Mexican government so

---

7. This agreement, too, was ratified by the President and Congress of Mexico.

8. The 1925 Modification did not alter the right of the receipt holders to recover the underlying coupons or other instruments in the event that the Mexican government or the railways defaulted.

that the government could determine whether the owners were enemy or non-enemy aliens. The right to register under this decree terminated on December 29, 1951 pursuant to the Law on the Destination of Enemy Bonds ("the Enemy Bonds Act").

All holders of Receipts for Interest in Arrears who presented their receipts for registration pursuant to the August 4, 1942 decree had their receipts retired pursuant to either the 1942 or 1946 Agreement with the Committee. Thus, any Receipts for Interest in Arrears presently in existence, including those held by plaintiff, were not registered as required under the 1942 decree. Moreover, pursuant to the Enemy Bonds Act, all receipts which were not so registered passed to the ownership of the Mexican government, with no rights retained by the holders.

## II

By way of further background, the Court notes that this is not the first action to be filed in the United States relating to the Receipts for Interest in Arrears or other instruments issued under the 1922 Agreements. In 1932, a number of bondholders who had deposited their receipts pursuant to the 1922 Deposit Agreement filed a series of lawsuits in New York against the Committee to obtain priority in the distribution of approximately $7 million held by the Committee—the Committee had distributed $33 of the $45 million paid by the government of Mexico between 1923 and 1928 and retained another $5 million for its own expenses. The Mexican government, which also sought to recover this $7 million, argued, by special appearance, that it was a necessary party to the litigation, and that the proceedings could not go forward since the New York courts lacked jurisdiction over it.

Although Mexico's argument was initially successful, the New York courts ultimately affirmed the findings of the court-appointed referee that the Committee was not an agent of Mexico, and that the government of Mexico was not a party to the Deposit Agreement of 1922 under which the receipts were issued. On that basis, the litigation was allowed to go forward without Mexico, and the Committee was ultimately ordered to make an accounting of the remaining assets it held and to distribute such assets in an appropriate manner.

A second lawsuit was filed against the Committee in 1952, again in a New York State court, to determine the distributive rights of certain claimants to the remaining funds held by the Committee. Among the parties to this action were Guaranty Trust Company of New York and Bankers Trust Company—the stakeholders of the past due interest coupons which were turned over to the Committee in exchange for Receipts for Interest in Arrears. As previously noted, the 1922 Agreements provided that the holders of the receipts could recover the underlying coupons if the Mexican government or the railways failed to provide funds sufficient to purchase or redeem the receipts. The court, however, found that these coupons had no substantial monetary value apart from the offers to purchase made by the Mexican government in 1942 and 1946. Guaranty Trust Company was directed to publish notices stating that depositors could withdraw their coupons and rights to interest from the two banks within the next six months. Following this six month period, the court authorized the banks to destroy the remaining coupons and thereby discharged them from any obligations thereunder. The court also discharged the Committee and ordered that it be dissolved upon payment of its remaining funds to Guaranty Trust Company of New York.

## III

Based on the foregoing facts,[9] it is clear that, as a matter of substantive contract

---

**9.** The background information recited above comes from defendant's brief and the affidavit of Miguel Valdes-Villarreal, exhibit A to defend-ant's motion to dismiss or for summary judgment. Plaintiff has not controverted any of these statements of fact.

law, plaintiff cannot recover money due on receipts for interest in arrears issued under the 1922 Deposit Agreement. However, Mexico has not moved to dismiss or for summary judgment on this ground. Rather, it argues that this Court lacks jurisdiction over it under the doctrine of sovereign immunity.

■ The Foreign Sovereign Immunities Act (FSIA) provides the sole basis for subject matter jurisdiction over suits against foreign states. 28 U.S.C. §§ 1330, 1604. *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983); *Asociacion de Reclamantes v. United Mexican States*, 735 F.2d 1517 (D.C.Cir.1984); *McKeel v. Islamic Republic of Iran*, 722 F.2d 582 (9th Cir.1983); *Goar v. Compania Peruana de Vapores*, 688 F.2d 417 (5th Cir.1982); *Rex v. Cia. Compania Pervana de Vapores*, 660 F.2d 61, 65 (3d Cir.1981); *Williams v. Shipping Corp. of India*, 653 F.2d 875, 880–81 (4th Cir.1981); *Ruggiero v. Compania Peruana de Vapores*, 639 F.2d 872, 875–76 (2d Cir.1981). The FSIA, which was enacted in 1976, codified the so-called "restrictive" principle of foreign sovereign immunity.[10] Under this theory, a foreign state is immune from suits for its sovereign or public acts (actiones jure imperii), but it is not immune for its private or commercial acts (actiones jure gestionis).

The FSIA sets forth the general rule that "a foreign state shall be immune from the jurisdiction of the courts of the United States," 28 U.S.C. § 1604; and then lists several specific exceptions to that rule. The exception upon which plaintiff relies is that for commercial activity,[11] the largest and most important exception to immunity. *Asociacion de Reclamantes, supra*, 735 F.2d at 1520. The Act defines the term "commercial activity" to mean "either a regular course of commercial conduct or a particular commercial transaction or act," 28 U.S.C. § 1603(d). The Act further provides that "[t]he commercial character of an activity ... be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." *Id.*

■ Mexico concedes that, based on the legislative history of the FSIA, Congress intended to include government borrowing or the issuance of public debt within the commercial activity exception to sovereign immunity.[12] Nevertheless, Mexico argues

---

**10.** The Executive Branch formally adopted the principle of restrictive sovereign immunity in 1952. 26 Dept. of State Bull. 984–85 (1952) (the "Tate Letter"), reprinted in *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 711–15, 96 S.Ct. 1854, 1869–71, 48 L.Ed.2d 301 (1976). In the so-called "Tate Letter," the State Department publicly took the position that henceforth it would recommend to the United States courts that as a matter of policy, a foreign state should be granted immunity only for its sovereign or public acts and not for its private acts.

**11.** 28 U.S.C. § 1605(a)(2) provides that:

A foreign state shall not be immune from the jurisdiction of courts of the United States or the States in any case—

in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

**12.** See H.R.Rep. No. 1487, 94th Cong., 2d Sess., at 10, 16, reprinted in 1976 U.S.Code Cong. & Admin.News, 6604. See also Delaume, Public Debt and Sovereign Immunity: The Sovereign Immunities Act of 1976, 71 Am.J.Int'l L. 399, 405 (July 1977); Von Mehren, The Foreign Sovereign Immunities Act of 1976, 17 Colum.J. Trans.L. 33, 49 n. 69 (1978).

The FSIA, as first proposed, contained a section (proposed section 1606) which provided that all debts of sovereigns would remain beyond the jurisdiction of the United States courts. See H.R. 11315, 93d Cong., 1st Sess. (1973); H.R. 11315, 94th Cong., 1st Sess. (1975); Hearings on H.R. 3493 before the Subcommittee on Claims and Government Relations of the House Committee on the Judiciary, 93d Cong., 1st Sess. (1973). The Committee ultimately deleted this section as unnecessary because it found that United States lenders "invariably include an express waiver of immunity in the debt instrument." H.Rep. No. 94–1487, *supra*, at 10; S.Rep. No. 1310, 94th Cong., 2d Sess. 7 (1976); U.S.Code Cong. & Admin.News 6609 (1976).

The United States District Court in *Asociacion de Reclamantes, supra*, however, made the following observations:

that the FSIA does not confer subject matter jurisdiction over this case because (1) Congress did not intend the Act to be applied retroactively and (2) even if the FSIA were applicable, the receipts are not analogous to public debt and the activities of the Mexican government with respect to the 1922 Agreement, under which the receipts were issued, do not constitute "commercial activity" within the meaning of section 1605(a)(2). For the reasons stated below, the Court finds that the FSIA cannot be applied retroactively to this case where all the operative events occurred before 1952. Accordingly, plaintiff's action will be dismissed for want of subject matter jurisdiction.[13]

■ The question of the retroactive application of the FSIA to pre-1952 transactions was recently decided by the United States District Court for the Northern District of Alabama in *Jackson v. People's Republic of China*, 596 F.Supp. 386 (N.D. Ala.1984),[14] a case similar in several respects to the case at bar. In *Jackson*, a group of United States holders of Hukang Railroad bonds issued in 1911 by The Imperial Chinese government sued the People's Republic of China to recover the unpaid principal and interest on these bonds. The court after setting aside the default judgment it had previously entered against China, dismissed the action for want of subject matter jurisdiction based on its conclusion that

> Proposed section 1606 was ambiguous in that it applied to all debts, not just general governmental obligations. The State Department considered amending it but then decided that no provision was better than a more precise provision which identified only non-commercial debts for general government obligations as eligible for *per se* sovereign immunity....
>
> The 1976 House Report specifically discusses the deletion of proposed section 1606 to which the above quoted passage referred. The Committee appears to have ignored the fact that a public debt could exist in other than the commercial lending context. It merely suggests that only public debts "which are of a commercial nature and should be treated like other commercial transactions" are excepted from sovereign immunity ... The non-commercial debt obligation is thus

neither the language of the FSIA nor its legislative history evince that it be retroactively applied; and to apply the FSIA in this action would clearly alter the antecedent rights of China.

596 F.Supp. at 389. The Court finds the reasoning of the *Jackson* court persuasive and concurs in its holding.

■ It is axiomatic that retroactive application of statutes is disfavored. *Greene v. United States*, 376 U.S. 149, 160, 84 S.Ct. 615, 621, 11 L.Ed.2d 576 (1964); *In re District of Columbia Workmen's Compensation Act*, 554 F.2d 1075, 1079 (D.C.Cir. 1976). The Supreme Court in *Union Pac. R. Co. v. Laramie Stock Yards Co.*, 231 U.S. 190, 34 S.Ct. 101, 58 L.Ed. 179 (1913), explained this basic canon of statutory construction as follows:

> ... [T]he first rule of construction is that legislation must be considered as addressed to the future, and not to the past. The rule is one of obvious justice and prevents the assigning of a quality or effect to acts or conduct which they did not have or did not contemplate when they were performed. The rule has been expressed in varying degrees of strength, but always of one import, that a retrospective operation will not be given to a statute which interferes with antecedent rights ... unless such be "the unequivocal and inflexible import of the terms, and the manifest intention of

arguably immune by implication and may place the "internal obligations" in dispute in this case outside the scope of Section 1606 exceptions.

This is in accordance with the historical meaning of a "public debt," which was considered a *per se* public act and a sufficient basis for sovereign immunity.

561 F.Supp. 1190, 1195–96 n. 10 (citations omitted).

**13.** Because the Court finds that the question of the FSIA's retroactivity is dispositive, it need not address the other issues raised by Mexico.

**14.** In *Jackson*, the United States intervened on behalf of China by filing a "Statement of Interest" in which it argued against retroactive application of the FSIA to the conduct of foreign states predating 1952.

the legislation." [quoting *United States v. Heth,* 3 Cranch (7 U.S.) 399, 413, 2 L.Ed. 479.]

231 U.S. at 199, 34 S.Ct. at 102.

From 1922 when the Receipts of Interest of Arrears were issued until 1951 when the deadline for registration under the Enemy Bonds Act occurred,[15] the United States recognized and adhered to the theory of absolute sovereign immunity. Thus, an action, such as this, against a foreign state for the collection of a public debt did not exist during the times relevant to this controversy. In 1952, the Executive Branch formally adopted the restrictive theory of immunity, but it was applied only gradually by the courts in the following years.[16] Thus, in order to apply the restrictive theory of sovereign immunity as codified in the FSIA to this case, the Court would have to find that retroactivity was the "unequivocal and inflexible import of the terms, and the manifest intention of the legislation." *Union Pac. R. Co. v. Laramie Stock Yards Co., supra,* 231 U.S. at 199, 34 S.Ct. at 102. This, the Court cannot do.

The statutory language and legislative history of the FSIA provide no support for the retroactive application of the Act to transactions occurring before 1952. To the contrary, the language of the Act is prospective, providing that "claims of foreign states to immunity *should henceforth* be decided by courts of the United States in conformity with the principles set forth in this chapter." 28 U.S.C. § 1602 (emphasis added). The prospective nature of the Act is underscored by the fact that Congress delayed the effective date of the FSIA for a 90 day period so as to give foreign states advance notice of the Act's provisions and the United States' new policy. 28 U.S.C. § 1602 note.

Moreover, there is nothing in the legislative history to indicate that Congress intended the FSIA to be applied retroactively to transactions predating 1952. The committee reports reveal that the Tate letter played a pivotal role in shaping United States policy concerning the immunity of foreign sovereigns after 1952 and that the FSIA was merely designed to codify the restrictive principle of sovereign immunity embodied in that letter—"[t]he bill is not intended to affect the substantive law of liability." S.Rep. No. 94–1310, 94th Cong., 2d Sess. 11 (1976); H.R.Rep. No. 94–1487, 94th Cong., 2d Sess. 12 (1976). Retroactive application of the Act would repudiate the immunity of foreign sovereigns for transactions predating 1952 and thus be inconsistent with Congress' intent not to affect the substantive law of liability.[17]

---

**15.** Although the original plan and Agreement of 1922 provided for payments by Mexico until 1968, all the operative events precluding such payments occurred before 1952: the original bonds were issued in the late 1800's and early 1900's, the interest payments were suspended in 1914, the settlements of receipts through a series of agreements took place in the 1920's and 1940's, and the Enemy Bonds Act's final registration deadline was in 1951.

**16.** Mexico contends that after the United States endorsed the restrictive theory of sovereign immunity, certain fiscal matters, including the issuance of public debt, continued to be considered governmental in nature and therefore immune. See *National City Bank v. Republic of China,* 348 U.S. 356, 75 S.Ct. 423, 99 L.Ed. 389 (1955); *Victory Transport, Inc. v. Comisara General de Abastecimientos y Transportes,* 336 F.2d 354 (2d Cir.1964). Thus, according to Mexico, it was not until 1976 when the FSIA was enacted that the transaction at issue could be regarded as private commercial activity.

**17.** Other courts which have addressed the issue of retroactivity have reached a similar conclusion. See, *e.g., Corporacion Venezolana de Fomento v. Vintero Sales Corp.,* 629 F.2d 786, 791 (2d Cir.1980) (Congress did not intend for the FSIA to confer subject matter jurisdiction retroactively); *Amoco Overseas Oil Co. v. Compagnie Nationale Algerienne,* 605 F.2d 648, 654 (2d Cir. 1979) (It was not the "manifest intention of the legislative" to apply the FSIA retroactively. To do moreover, would prejudice very substantial antecedent rights of the parties). *Cf. Ohntrup v. Firearms Center Inc.,* 516 F.Supp. 1281, 1283–84 (E.D.Pa.1981), *aff'd,* 760 F.2d 259 (3d Cir.1985) (While noting that the substantive immunity principles set forth in the FSIA have been given retroactive effect, the court declined to give the provisions governing subject matter jurisdiction retroactive effect); *Yessenin-Volpin v. Novosti Press Agency,* 443 F.Supp. 849, 851 n. 1 (S.D.N.Y. 1978) (Based on its finding that the FSIA does not create new rights of immunity but merely codifies the restrictive principle of sovereign immunity, the court concluded that applying the

Finally, to apply the FSIA to the underlying transactions would clearly prejudice the antecedent rights of Mexico.[18] Between 1922 and 1951, the government of Mexico could safely assume that the then existing doctrine of absolute immunity governed any commercial transaction between it and the United States or its citizens. Mexico could therefore not reasonably anticipate being haled into court in the United States for defaulting on public debt instruments. Nor, for that matter, could holders of bonds and interest coupons reasonably expect to bring an action against Mexico in a United States court in the event of such a default.[19] The Court finds that because Mexico may have reasonably relied on these factors in structuring its conduct prior to 1952, it would be inequitable to divest Mexico of the absolute immunity it enjoyed in 1922 by applying the FSIA to this case. See *Insurance Company of North America v. Marina Salina Cruz*, 649 F.2d 1266, 1272 (9th Cir.1981) (In actions arising under the FSIA, it must be determined "whether that Act gives such clear notice to foreign countries as to remove, as a reasonableness factor, the expectations of immunity of

agencies of foreign countries performing commercial functions.").[20]

In conclusion, the Court finds that on the basis of the statutory language and the legislative history of the FSIA as well as the case law and the "Statement of Interest" filed by the Executive Branch in *Jackson, supra,*[21] the FSIA should not be applied retroactively to commercial activities or transactions of a foreign sovereign occurring before 1952.

ORDERED that defendant's motion to dismiss be and it hereby is granted; and it is further

ORDERED that this action be and it hereby is dismissed.

---

substantive provisions of the FSIA to an action commenced before its effective date would not interfere with the antecedent rights of the parties).

The Court notes that in all the above-cited cases, the underlying events or transaction occurred and the cause of action accrued after 1952.

**18.** The Court notes that the FSIA was not enacted until 24 years after the restrictive theory was adopted in 1952. Thus, there was no reason for Congress to consider the question of retroactivity since presumably causes of action more than 24 years old would be barred by the statute of limitations. See *Schmidt v. Polish People's Republic,* 742 F.2d 67 (2d Cir.1984). In *Schmidt,* the court dismissed as time barred an action to recover on defaulted treasury notes issued by the Republic of Poland in 1929 and 1930. The court rejected plaintiffs' argument that the FSIA revived all claims existing against foreign governments before the FSIA's passage. While noting that the Act enhanced a party's capacity to obtain personal jurisdiction over a sovereign state, the court found that

> nothing in its language or legislative history indicates that such wholesale reactivation of

ancient claims was intended. Moreover, since the "Tate Letter" of 1952, ... foreign sovereign immunity had not extended to the commercial activity of a foreign state, such as is involved here, ... and Congress had no reason whatsoever to believe that it was reviving otherwise dormant claims based on such activity.

742 F.2d at 71 (citations omitted).

**19.** The formation of the Committee, the lengthy and repeated negotiations undertaken by that Committee with the Mexican government, and the numerous agreements under which Mexico agreed to repay the debts bolster this finding.

**20.** In its Statement of Interest filed in *Jackson, supra,* the United States argued that the FSIA should not be applied retroactively to transactions predating 1952 since to do so would upset the settled expectations of foreign states. See also, *Berizzi Brothers Co. v. S.S. Pesaro,* 271 U.S. 562, 571–73, 46 S.Ct. 611, 611–12, 70 L.Ed. 1088 (1926); *The Schooner Exchange v. McFaddon,* 11 U.S. (7 Cranch) 116, 3 L.Ed. 287 (1812).

**21.** Attached to defendant's motion to dismiss or for summary judgment.