GODBOLD, Chief Judge:
We must decide whether in this case the courts of the United States have subject matter jurisdiction over the People’s Republic of China. This requires us to examine whether the Foreign Sovereign Immunities Act of 1976 (FSIA), 28 U.S.C. § 1330, 1391 and 1602, et seq., which confers subject matter jurisdiction over foreign sovereigns (with various exceptions), is to be applied retroactively with respect to actions by the governments of China relating to bonds issued by the government of China in 1911.
Before reaching the central issue, we must decide whether the district court erred in setting aside a default judgment entered against the PRC.
The People’s Republic (PRC) also raises as a preliminary issue whether, under principles of international law, despite the domestic law of the United States, the courts of the United States have no jurisdiction over any claims against the PRC as a sovereign nation.
The district court entered three determinations. Jackson v. People’s Republic of China, 550 F.Supp. 869 (N.D.Ala.1982) (finding jurisdiction and entering default judgment); unpublished order, 2/27/84 (setting aside default judgment); 596 F.Supp. 386 (N.D.Ala.1984) (finding no jurisdiction and dismissing the case).
We hold that the district court did not err in setting aside the default judgment against the PRC. And, reaching the central issue, we hold that the district court was correct in holding that it lacked subject matter jurisdiction because the FSIA did not apply retroactively to confer subject matter jurisdiction in this case.
I. The facts and the proceedings in the district court
In 1911 the Imperial Government of China issued bearer bonds to assist in financing the building of a section of the Hu-kuang Railway that runs between Guangzhou (Canton) and Beijing (Peking). The loan was for 6,000,000 pounds sterling, negotiated and participated in by a consortium of British, German, French and American banks. The loan agreement authorized the issuance of bonds for sale in the United States and bonds were sold to purchasers in this country.
Soon after the bonds were issued the Revolution of 1911 ensued, and the Republic of China supplanted the Imperial Chinese government. The Republic of China made interest payments on the Hukuang bonds until the mid-1930’s when it began to have financial and other difficulties.
Plaintiffs introduced expert testimony in the district court attempting to show that *1484 the bonds were renegotiated in 1937 by an agreement between the Chinese Nationalist government and an American bondholders’ committee representing the lenders, providing for an interim interest rate reduction and for amortization to begin again in 1949 and to be completed in 39 years from 1937, which would be 1976. Statements filed by the PRC say that renegotiation was discussed but no agreement reached. Plaintiffs say that the obligations under the bonds were “reaffirmed” by the Nationalist government just before its departure for Taiwan in 1948. The district court found that the renegotiation was never agreed upon, 550 F.Supp. at 852; 596 F.Supp. at 388 n. 2, and that the bonds matured in 1951, the original maturity date. Plaintiffs assert that these findings are plainly erroneous.
This class suit was filed November 13, 1979. Jurisdiction was alleged under the FSIA. Service of process was carried out under 28 U.S.C. § 1608(a)(4). PRC responded with a diplomatic note to the Department of State asserting that it enjoyed absolute sovereign immunity. In October 1981 the district court certified a class consisting of all persons who, as of October 22, 1981, were holders of the bonds. On October 28,1981 the district court held that service of process was proper and, PRC not having appeared, ordered a default. PRC was served with a copy of the class certification order and the notice of default but returned them to the State Department, reasserting absolute immunity.
At plaintiffs’ request an evidentiary hearing was conducted. On September 2, 1982, the court held that it had subject matter jurisdiction and that plaintiffs were entitled to all unpaid principal and interest on the bonds, and it entered a judgment of $41,000,000-plus. 550 F.Supp. 869. The PRC sent a diplomatic note to the district court in January, 1983, stating that the rulings of the district court violated “basic norms of international law,” and should the court proceed with the default judgment against China and attach China’s properties in the United States, the Chinese government reserved its right to take “corresponding measures.”
In mid-1983 the plaintiffs began efforts to execute on their judgment. In July or August 1983 the PRC appeared in the case for the first time, filing motions to vacate the judgment under Rule 60(b)(1), (4) and (6) and to dismiss the case. The United States, through the Departments of State and Justice, filed two statements of interest, supported by numerous documents, backing the PRC’s motions.
The district court granted the motion to vacate and conducted an evidentiary hearing on the motion to dismiss and determined it would be treated as a motion for summary judgment. Plaintiffs presented expert testimony. PRC did not appear; the United States was present but did not participate. The district court entered an order dismissing the case on the ground that the FSIA did not have retroactive effect so as to confer subject matter jurisdiction over transactions that predated 1952. 596 F.Supp. 386.
In this court the PRC filed a brief but instructed its counsel not to appear for oral argument. The United States filed a statement of interest and was permitted to argue.
II. Changing concepts of sovereign immunity under U.S. law
For more than a century and a half, since The Schooner Exchange v. McFaddon, 11 U.S. (7 Cranch) 116, 137 (1812), the United States usually granted foreign sovereigns complete immunity from suit in the courts of this country. Under our law foreign sovereign immunity is a matter of grace and comity on the part of the United States and is not a restriction imposed by the Constitution itself. Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983). Accordingly, until 1952, our courts consistently deferred to the decisions of the executive *1485 branch on whether to take jurisdiction of actions against foreign sovereigns and their instrumentalities. Ordinarily the State Department would request immunity in all actions against friendly foreign sovereigns. Id. at 486, 103 S.Ct. at 1967. However, in the decade before 1952 the Supreme Court’s doctrinal foundation for sovereign immunity began to shift from formal principles of international law to avoiding embarrassment to those responsible for the conduct of our foreign affairs. Victory Transport, Inc. v. Comisaria General de Abastecimientos y Transportes, 336 F.2d 354, 357 (2d Cir.1964), cert. denied 381 U.S. 934, 85 S.Ct. 1763, 14 L.Ed.2d 698 (1965); Ex Parte Peru, 318 U.S. 578, 63 S.Ct. 793, 87 L.Ed. 1014 (1943); Republic of Mexico v. Hoffman, 324 U.S. 30, 65 S.Ct. 530, 89 L.Ed. 729 (1945).
In 1952 the State Department issued the “Tate Letter,”[1] which announced formal adoption by it of the “restrictive” theory of foreign sovereign immunity. Under this theory immunity is confined to suits involving the public acts of a foreign sovereign and does not extend to cases arising out of strictly commercial acts of a foreign state. After the Tate Letter the executive, acting through the State Department, usually would make “suggestions” on whether sovereign immunity should be recognized by a court, and courts generally abided these suggestions. This proved troublesome, because foreign nations at times placed diplomatic pressure on the State Department, and political considerations led to suggestions of immunity where it was not available under the restrictive theory. Verlin-den, 461 U.S. at 487, 103 S.Ct. at 1968. Moreover, foreign nations did not always make requests to the State Department, and responsibility fell to the courts to determine whether sovereign immunity existed. With two different branches involved the governing standards were neither clear nor uniform. Id. at 488, 103 S.Ct. at 1968.
In 1976 Congress passed the FSIA, effective in January 1977.
By reason of its authority over foreign commerce and foreign relations, Congress has the undisputed power to decide, as a matter of federal law, whether and under what circumstances foreign nations should be amenable to suit in the United States.
Id. at 493, 103 S.Ct. at 1971. It was adopted to free the government from case by case diplomatic pressures, to clarify the governing standards, and to assure that decisions are made on purely legal grounds and under procedures that insure due process. Id. at 488, 103 S.Ct. at 1968. In 28 U.S.C. § 1330 the Act confers jurisdiction of any in personam nonjury civil action against a foreign state with respect to which the foreign state is not entitled to immunity under §§ 1605-1607. The latter sections codify into federal law the restrictive theory of sovereign immunity. Thus in many instances the substantive immunity law issues arising out of the sovereign immunity sections, §§ 1605-1607, must be resolved to determine if the court has jurisdiction. Corporacion Venezolana de Fomento v. Vintero Sales Corp., 629 F.2d 786, 790 n. 4 (2d Cir.1980), cert denied 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981).
Both subject matter jurisdiction and personal jurisdiction turn on application of the substantive provisions of the FSIA. If none of the exceptions to sovereign immunity set forth in the Act applies, the court lacks both statutory subject matter jurisdiction and personal jurisdiction. Verlin-den, 461 U.S. at 485 n. 5 and 493, 103 S.Ct. at 1967 n. 5 and 1971. In determining whether the court has jurisdiction through application of one of the exceptions, the court must apply the detailed federal law standards set forth in the Act itself. Id. at 494, 103 S.Ct. at 1971.
*1486 III. Absence of jurisdiction because of international law
At the threshold China stands on the principle of absolute sovereign immunity as a fundamental aspect of its sovereignty. Its position is that under principles of international law it is immune from any suit in a domestic court of any other nation unless it consents. According to the United States’ statement of interest:
China’s adherence to this principle results, in part, from its adverse experience with extraterritorial laws and jurisdiction of western powers [within China] in the nineteenth and early twentieth centuries.
China asserts that restrictive sovereign immunity has not become a rule of international law, although in recent years some nations have begun to follow it, but these are, China says, only a small number of nations and by and large do not include developing countries, which find restrictive sovereign immunity not in their interest.
China contends that the United States cannot, by a change in its domestic law, abrogate the long accepted international law principle of absolute sovereign immunity. Even though restrictive sovereign immunity may be a developing customary rule of international law, China says that it is not binding upon sovereign states that do not agree to it. Thus, according to China, restrictive sovereign immunity is applicable only within the group of nations that have adopted it and is not applicable to China, which continues to adhere to the principle of absolute sovereign immunity. Finally, China contends that even if sovereign immunity can be changed by the United States, to apply the change retroactively would violate international law.
The district court did not rule on these international law questions, since it held that the suit was barred under United States domestic law. We follow the same course.
IV. Setting aside the default
The district court set aside the default judgment under Fed.R.Civ.P. 60(b), which provides in pertinent part:
On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment.
Motions under Rule 60(b) are directed to the discretion of the trial court. The rule is equitable in origin, and the court may take action appropriate to accomplish justice. Klapprott v. U.S., 335 U.S. 601, 614-15, 69 S.Ct. 384, 390-91, 93 L.Ed. 1099 (1949). In the exercise of its discretion the trial court must carefully interpret the provisions of the rule to preserve the delicate balance between the sanctity of final judgments and the demands of justice. Griffin v. Swim-Tech Corp., 722 F.2d 677 (11th Cir.1984).
We hold that the district court did not abuse its discretion in granting the PRC’s motion under subsection (6) of Rule 60(b), which authorizes the court to set aside a judgment for all reasons except those set forth in the five preceding clauses. This subsection gives the courts ample power to vacate judgments whenever appropriate to accomplish justice. Menier v. U.S., 405 F.2d 245 (5th Cir.1968); Moore’s Federal Practice § 60.27[2]. Relief under this clause, however, is an extraordinary remedy, which may be invoked only upon a showing of exceptional circumstances. Ackermann v. U.S., 340 U.S. 193, 200, 71 *1487 S.Ct. 209, 212, 95 L.Ed. 207, 212 (1950); Griffin, 722 F.2d at 680. This case presents extraordinary circumstances justifying the district court’s exercise of its equitable discretion.
Until January 1, 1979 the United States recognized the Republic of China, not the PRC, as the sole government for all of China. After recognition of the PRC, and beginning as early as 1980, representatives of the State Department attempted to explain to the PRC that the issue of sovereign immunity in this case must be decided by the courts of the United States and could not be determined by the executive branch and that PRC should retain counsel to appear in the district court and urge sovereign immunity and any other defenses.
In 1983 the United States sent a delegation to Beijing, and six days of meetings ensued concerning major international matters. The Chinese leader Deng Xiaoping brought up the default judgment and indicated to Secretary of State Schultz that the PRC regarded it as a serious matter and a major irritant in bilateral relations with the United States. During 1983 the foreign minister of China presented the Secretary of State with an Aide Memoire stating that the PRC recognized no obligation to pay external debts incurred by earlier Chinese governments and that the PRC enjoyed absolute sovereign immunity. In additional meetings in Washington and Beijing the United States sought to assure China that it could appear through counsel without conceding jurisdiction under the FSIA and without waiving its position that it enjoyed absolute immunity under international law. The PRC reluctantly agreed to retain counsel to present its views in court.
The United States explained in its statements that because of the long absence of relations between the United States and the PRC there were only limited communications between the two governments on legal matters, leaving PRC authorities generally unfamiliar with United States judicial practice and procedure; that the Chinese view the bonds as an improper part of the Western powers’ domination of China at the beginning of this century and as a direct cause of the Revolution of 1911; and that the PRC maintains that under the principle of non-liability for “odious debts” China bears no responsibility for the bonds.
In its statements of interest the United States urged that the default be set aside. In support of this position, Secretary of State Shultz filed an affidavit, setting out inter alia:
The United States has had extensive consultations with the PRC [Peoples Republic of China] about this case and is informed about its facts and history. The United States believes that the PRC’s initial failure to appear in these proceedings was based on its belief that international law did not require it to do so____ The United States has expended considerable diplomatic efforts over the last two and one-half years to persuade the PRC that it is appropriate under international and United States law, and in the best interest of bilateral relations between the two nations, that the PRC appear and present its defenses to this Court____ Permitting the PRC to have its day in court will significantly further United States foreign policy interests; conversely denying it that day in court is likely to have a negative impact on United States interests.
******
The present proceedings, and the default judgment against the PRC in particular, have become a significant issue in bilateral United States/China relations, as evidenced by Chairman Deng’s personal representations to me in February [1983], by China’s representations to other Department officials throughout the duration of this lawsuit, and by the repeated diplomatic notes from the PRC that have been filed in these proceedings. The manner in which these proceedings are finally resolved can be expected, there *1488 fore, to have ramifications for other important United States interests with respect to China.
Also the district court had been notified by the PRC that if China’s property in the United States was attached it reserved its right to take “corresponding measures.”
We hold that the district court did not abuse its discretion in setting aside the judgment under Rule 60(b)(6). The district court correctly recognized that its Rule 60(b) power was discretionary and must be liberally construed to achieve substantial justice. It noted that the law disfavors default judgments. It pointed out, on the other hand, the desirability that final judgments not be lightly disturbed. And, it noted that where a defendant has meritorious defenses the interest in resolving the case on the merits prevails over the interest in finality of judgments. The PRC did have a defense — lack of subject matter jurisdiction.[2] In considering whether it should exercise its equitable discretion and whether extraordinary circumstances were involved, the court properly gave consideration to the Secretary of State’s assessment of the foreign policy implications of the default judgment. Balancing all interests, the court found that it would be an abuse of discretion not to grant the motion under (4) and (6) of Rule 60.[3] We cannot fault this decision as to (b)(6).
Subsection (b)(4) provides that a judgment may be set aside because it is void. The court based its holding under this subsection on “the existence of pregnant questions relative to the jurisdiction of the Court.” We do not need to address this ruling.
Transit Casualty Co. v. Security Trust Co., 441 F.2d 788 (5th Cir.1971), holding that 60(b)(1) and (b)(6) are mutually exclusive and that a reason for relief under (b)(1) cannot be a basis for relief under (b)(6), did not bar the court from acting under (b)(6). In Transit Casualty a litigant sought to proceed under (b)(6) for a mistake pure and simple. Here much more is involved than mistake, inadvertence, surprise, or excusable neglect. The concerns extend to the misconception by an ancient and proud sovereign of its responsibility to reply to the demands of a United States court whose authority it does not recognize as a matter of international law, at a time when concepts of United States law and international law are changing. The issues arise in the highly sensitive area of relations of our government with another sovereign with whom tolerable relations have been restored after many years. They affect not only the interests of the PRC but of our own nation. In Transit Casualty itself the district court had considered whether relief should be granted under the broad equitable powers of (b)(6) and had found no basis to exercise its discretion, and this court, despite the language it used, reviewed this finding and affirmed it.
Plaintiffs urge that the PRC is not entitled to an exercise of equitable discretion under (b)(6) because it has not offered to do equity. The gist of their argument is that China is acting inequitably because it continues to insist that as a matter of international law it enjoys absolute sovereign immunity which the United States cannot abrogate without its consent. We reject out of hand the contention that in seeking an adjudication of jurisdictional issues arising *1489 out of United States domestic law China acts improperly in reserving what it conceives are its rights under international law.
Y. Jurisdiction under the FSIA
In the district court, after the default was set aside, and before this court, the United States has asserted that the FSIA was not intended to apply to transactions that predate 1952.[4]
The district court held that the FSIA did not apply retroactively to confer subject matter jurisdiction in this case. The court originally concluded that issuance of the bonds was a “commercial activity” under § 1605(a)(2). “Commercial activity” is defined in § 1603(d). Later, after China appeared, the court expressed doubt about its conclusion, but, because of its holding of lack of jurisdiction, did not resolve the matter.
The district court made its analysis on the basis that the bonds matured in 1951. It considered general principles that militate against retroactive application of statutes. Against this background, the court examined three areas: the language of the statute, the legislative history, and the effect of retroactivity on antecedent rights of China. The court concluded that the Act itself contained no statement indicating that restrictive immunity was intended to apply to transactions that predated 1952. It noted, to the contrary, language of the Act that appeared to be prospective, “[cjlaims of foreign states to immunity should henceforth be decided by courts of the United States in conformity with the principle set forth in this chapter.” 28 U.S.C. § 1602. It noted further evidence of prospectivity in the provision for a 90 day delay period between enactment and effective date in order to give adequate notice to foreign nations of the United States’ new policy of restrictive immunity. 28 U.S.C. § 1602 note “Effective Date.”
The court examined the legislative history and found no support for retroactive application.
With respect to antecedent rights, the court noted that from 1911 to the date of maturity of the bonds in 1951 China relied on the expectation that the extant and almost universal doctrine of absolute sovereign immunity governed relations between China and the United States and between the citizens of the two countries. Concom-mitantly, China had no apprehension of being brought into court in the United States to answer for a default of the bond issue. Nor did the predecessors in interest of the bondholders’ class have any expectation of any right to sue in the United States upon default. The court held that the statute should not be retroactively applied to alter antecedent rights unless it was the unequivocal import of its terms or the manifest intention of the legislators, a test set out in Greene v. U.S., 376 U.S. 149, 160, 84 S.Ct. 615, 621, 11 L.Ed.2d 576 (1964). It held the import of the terms and manifest intent of Congress to be to the contrary.
We agree with the district court’s general approach to retroactivity. Courts normally presume that a legislative enactment is to apply prospectively, Cox v. Schweiker, 684 F.2d 310, 318 (5th Cir.1982), and the presumption is a strong one. U.S. v. Security Industrial Bank, 459 U.S. 70, 79, 103 S.Ct. 407, 413, 74 L.Ed.2d 235 (1982). We agree with the court’s analysis of the language of the statute itself and of the legislative history. Indeed, both Senate and House Reports state that FSIA was not intended to affect the “substantive law of liability.” S.Rep. No. 94-1310, 94th Cong., 2d Sess. 11 (1976); H.R.Rep. No. 94-1487, 94th Cong., 2d Sess. 12 (1976), U.S. Code Cong. & Admin. News 1976, p. 6610. We agree that to give the Act retrospective application to pre-1952 events would interfere with antecedent rights of *1490 other sovereigns (and also with antecedent principles of law that the United States followed until 1952). It would be manifestly unfair for the United States to modify the immunity afforded a foreign state in 1911 by the enactment of a statute nearly three quarters of a century later.[5]
Our decision is consistent with the leading case on the issue of retroactivity of the jurisdiction-conferring section of FSIA, Corporacion Venezolana de Fomento v. Vintero Sales, 629 F.2d 786 (2d Cir.), cert. denied 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1980), in which a suit based on diversity was filed before the enactment of the FSIA. Jurisdiction was lacking, and after enactment of the FSIA the district court found that the FSIA supplied a basis for jurisdiction. The circuit court pretermitted the issue of whether Congress had power to confer jurisdiction in a pending case where none existed because “we cannot agree with the district court’s view that Congress intended such retroactivity in the case of the FSIA.” Id. at 791. The court focused upon the function of § 1330 as jurisdiction-conferring. It discussed Andrus v. Charlestons Products, 436 U.S. 604, 98 S.Ct. 2002, 56 L.Ed.2d 570 (1978), in which a case heard by the district court under an incorrect theory of subject matter jurisdiction was saved, in a jurisdictional sense, by enactment after the case began of a statute whose effect was to vest the court with jurisdiction. The mechanism was congressional elimination of the amount in controversy requirement in suits against the United States or its officers. The Andrus court held that this elimination created jurisdiction retroactively. The Second Circuit held that Andrus relied on the remedial purpose of the elimination of the amount in controversy and represented congressional correction of a “lacuna.” In contrast, the court held passage of the FSIA was not to remedy a “lacuna” but rather was Congress’ first codification of principles of sovereign immunity law. This newly created jurisdiction was not intended to operate retroactively.
In Venezolana the district court had relied, as plaintiffs do, upon the language of the Act’s preamble in § 1602, which states that “henceforth” cases should be decided in accordance with the principles of the FSIA. The circuit court rejected this, reading the language to mean only that decisions made henceforth should be governed by the substantive principles of immunity law adopted in the Act, and holding that the preamble did not purport to say anything about the retroactive application of the subject matter jurisdiction provisions in § 1330. Moreover, the court specifically recognized a “Congressional mandate to leave intact the status quo ante January 24, 1977 as respects rights of the parties.” 629 F.2d at 790.
See also Martropico Compania Naviera S.A. v. Perusahaan [etc.], 428 F.Supp. 1035, 1037 (S.D.N.Y.1977): “[I]t seems clear that regardless of the effect of the Immunities Act on the removal of pending state actions, the original jurisdiction of the federal courts is prospective only.”
In Venezolana the Second Circuit distinguished Yessenin-Volpin v. Novosti Press Agency, 443 F.Supp. 849 (S.D.N.Y.1978) on the ground that it had applied substantive principles of immunity embodied in § 1605 to a case filed before the effective date of the FSIA and had not addressed the jurisdiction-conferring aspects of the Act. It distinguished other cases that have addressed the § 1330 jurisdiction-creating section in the context of removal statutes, which are construed strictly and involve the necessity of giving weight to the extent to which the action has progressed in the court where it was initially brought, Mar-tropico, supra, or in the context in which the presence of a grant of interim relief, such as attachment in rem, brought into play the congressional mandate to not in *1491 terfere with the rights of parties pre-January 24, 1977, e.g., Amoco Overseas Oil Co. v. Com. Nat. Algerienne de Navigation, 459 F.Supp. 1242 (S.D.N.Y.1978), aff'd 605 F.2d 648 (2d Cir.1979).
Since the district court’s decision in the present case the District Court for the District of Columbia has reached the same result in Slade v. the United States of Mexico, 617 F.Supp. 351. The court concurred with Jackson, and then made the same analyses of the policy against re-troactivity, legislative history, statutory language, and interference with antecedent rights, and reached the same result.
Plaintiffs rely upon Verlinden, but it upheld the constitutionality of the Act and remanded for the court of appeals to consider whether jurisdiction existed under the Act.
We find no case, and plaintiffs refer us to none, where the FSIA has been applied to confer subject matter jurisdiction over pre-1952 transactions, activities and events.
Plaintiffs have not contended that if the bonds were renegotiated in 1937 so as to mature in 1976, the existence of the bonds in the United States after 1952, the failure to make interest payments on them after 1952, and default on them in 1976, by themselves, are such activities and events that the sovereign immunity exceptions in § 1605 are triggered and § 1330 jurisdiction is created retroactively for the span of years back to 1952.[6] To the contrary, plaintiffs reject the possibility of retroactivity only back to 1952 and insist that re-troactivity is all or none.[7] They say that the language of § 1602 and the legislative history confirm a congressional expectation that the immunity standards of the Act apply to all future cases without exception. They reject the concept of a “bifurcated practice” distinguishing between events after January 24,1977 and suits arising from earlier events. Appellants Brief pp. 58-59. They repeat this position in their Reply Brief p. 31:
The appellant’s original brief points out at pages 58-64 that there is no authority to limit the retroactive application of the FSIA so long as the action was filed after adoption of the FSIA. There is certainly no authority to grant retroactivity, but then to limit it by an extraneous event, the date the Tate letter was written and published. The act is either retroactive or it is not.
The district court correctly held there was no subject matter jurisdiction over plaintiffs’ claim.
AFFIRMED.

. Reprinted in 26 Dept. of State Bull. 984-85 (1982) and in Alfred Dunhill of London, Inc. v. Cuba, 425 U.S. 682, 711, 96 S.Ct. 1854, 1869, 48 L.Ed.2d 301 (1976) (App. 2 to opinion of White, J.).

. Arguably the default judgment was void since subject matter jurisdiction was lacking because of sovereign immunity. But we do not base our decision on this ground.

. The district court observed that, in ruling on the default issue, it was not passing on the ultimate issue of subject matter jurisdiction, which it later reached in another order. This was an appropriate approach. The court had jurisdiction to examine its jurisdiction. As an incident of that examination it was free to inquire whether the judgment previously entered was to be vacated so that it could examine the jurisdictional issue free of any inferences that might flow from the existence of the judgment. As the court put it, after describing the sovereign immunity and FSIA questions: "The interests of justice require that these jurisdictional questions be determined in the context of adversarial proceedings."

. It has listed some six other cases pending in federal district courts asserting liability of foreign states for acts committed before 1952. These include suits against the USSR, Mexico, Poland and two against the PRC for bonds issued before 1920.

. The decision we reach obviates consideration of China’s contention that an interpretation giving the FSIA retroactive effect before 1952 would violate due process.

. Plaintiffs assert that the court erred in finding that the renegotiations were not agreed upon. But this assertion is made in the context of an argument that the district court might have reached a different conclusion about jurisdiction relating to the 1911 issuance had it realized that the bonds did not mature until 1976.

. There would be, of course, a substantial question whether the post-1952 events just described, by themselves, assuming renegotiation, are within the commercial activity provisions of § 1605(a)(2) and the definition of commercial activity in § 1603(d).