**Maria V. ALTMANN, Plaintiff,**

v.

**REPUBLIC OF AUSTRIA,
et al. Defendants.**

**No. CV 00–8913 FMC (AIJX).**

United States District Court,
C.D. California.

May 4, 2001.

As Amended May 9, 2001.

E. Randol Schoenberg, E. Randol Schoenberg Law Offices, Los Angeles, CA, for Plaintiff.

Scott P. Cooper, Jonathan E. Rich, Tanya L. Forsheit, Andrea K. Douglas, Proskauer Rose, Los Angeles, CA, for Defendants.

Margot A. Metzner, Janie F. Schulman, Sheila Olivarez Recio, Morrison Bostrom, Morrison & Foerster, Los Angeles, CA, David A. Lash, Bet Tzedek Legal Services, Los Angeles, CA, for Amicus.

## ORDER DENYING DEFENDANTS' MOTION TO DISMISS; ORDER GRANTING LEAVE TO AMEND COMPLAINT

COOPER, District Judge.

Plaintiff is the niece and heir of Adele Bloch–Bauer who was a model for, and whose husband was the owner of, works of

art painted by Gustav Klimt. Plaintiff brings this action to recover six Klimt paintings which were stolen by the Nazis and are presently in the possession of Defendants. By this Order, the Court concludes that it has jurisdiction over defendants by virtue of an immunity exception contained in the Foreign Sovereign Immunities Act.

This matter is before the Court on the Defendants' Motion to Dismiss under Fed. R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction, under Rule 12(b)(6) for failure to state a claim upon which relief may be granted,[1] under 12(b)(3) for lack of venue, under Rule 12(b)(7) for failure to join indispensable parties, and under the doctrine of *forum non conveniens*. For the reasons stated herein, the Defendants' Motion is **DENIED**.

## I. Background

### A. Factual Allegations of Complaint

#### 1. The Nature of the Dispute

The present dispute centers on ownership rights to six paintings by the world-renowned artist, Gustav Klimt. Specifically, at issue in the current action are six paintings with the following titles: *Adele Bloch–Bauer I, Adele Bloch–Bauer II, Beechwood, Apple Tree I, Houses in Unterach am Attersee*, and *Amalie Zuckerkandl* (collectively, "the paintings").[2] The paintings are currently in the possession of the Republic of Austria ("the Republic") and/or the Austrian Gallery ("the Gallery").[3] Plaintiff seeks recovery of these paintings that were owned by her family before they were stolen by the Nazis in the early 1940s in Austria.[4]

#### 2. Events in Pre–World War II Austria

The paintings at issue were owned by Ferdinand Bloch–Bauer, Plaintiff's uncle. Plaintiff's aunt, Ferdinand's wife, Adele Bloch–Bauer, died in 1925. When Adele died, she left a will asking that her husband consider donating six paintings to the Austrian Gallery on his death.[5] When the will was probated, the paintings were

---

1. Defendants' Rule 12(b)(6) motion was based on the act of state doctrine. Defendants have since withdrawn this motion.

2. The paintings at issue are valued at approximately $150 million. It appears that these paintings are significant works of art in the Gallery's collection. All the paintings, with the exception of *Amalie Zuckerkandl*, have been displayed in the Gallery within the last two years. *Adele Bloch–Bauer I* appears on the cover of the Gallery's guidebook, and *Adele Bloch–Bauer I, Adele Bloch–Bauer II,* and *Amalie Zuckerkandl* appear in a book entitled *Klimt's Women* that is edited by Gallery employees and distributed in the United States by Yale University Press. These three paintings were also featured in an exposition entitled *"Gustav Klimt: Portraits of European Women"* that was held from September 20, 2000, to January 7, 2001, in Vienna.

3. Collectively, the Republic and the Gallery are referred to as "Defendants" or "Austria".

4. Plaintiff is Jewish. She and her family suffered persecution under the Nazi regime in Austria and ultimately fled the country.

 Prior to 1938, Austria was an independent democratic republic. In 1938, the Nazis invaded Austria ("the Anschluss") and claimed Austria as a part of Germany. Almost immediately after the invasion, the Nazis enacted anti-Jewish laws and regulations that severely restricted the property rights of those of Jewish descent. Businesses and property belonging to Jews was "aryanized," i.e., given to non-Jewish individuals whose loyalty belonged to the Nazi party.

5. The six paintings addressed in Adele's will are *Adele Bloch–Bauer I, Adele Bloch–Bauer II, Beechwood, Apple Tree I, Houses in Unterach am Attersee*, and *Schloss Kammer am Attersee III*. The portrait of Amalie Zuckerkandl, which is also at issue in this action, was not among those mentioned in Adele's will. Conversely, *Schloss Kammer am Attersee III*, which was mentioned in Adele's will,

found to be part of Ferdinand's property, not Adele's. Ferdinand stated in 1926 that he intended to donate the paintings in accordance with his wife's wishes, but did not ever do so. Ferdinand donated one painting to the Gallery in 1936, a painting by Gustav Klimt entitled *Schloss Kammer am Attersee III.*

### 3. Plaintiff's Escape to the United States

Plaintiff was married shortly before the Nazi's annexation of Austria in 1938. Plaintiff and her husband escaped Austria to the Netherlands, to Britain, and finally to the United States. In 1942, Plaintiff arrived in Los Angeles, where she has lived since that time. Plaintiff became a naturalized citizen in 1945.

### 4. Ferdinand and His Artwork—The Nazi Occupation of Austria

Ferdinand left Austria in 1938; the Nazis took his home, his business, and his artwork. Four hundred pieces of porcelain were sold at public auction. Several Nineteenth century Austrian paintings went to Adolph Hitler's and Herman Göring's private collections. Dr. Erich Führer, a Nazi lawyer in charge of liquidating Ferdinand's collection, also benefitted.

The paintings at issue in the present suit were transferred in various ways:

*Adele Bloch–Bauer I* and *Apple Tree I* were traded in 1941 to the Austrian Gallery for *Schloss Kammer am Attersee III.*[6] *Adele Bloch–Bauer I* appears on the cover of the Gallery's official guidebook of the museum.

*Beechwood* was sold in November 1942 to the Museum of the City of Vienna. In

1947, the Museum offered to return the painting to Plaintiff and Ferdinand's other heirs (collectively, "the heirs") in exchange for refund of the purchase price. The painting was, in the late 1940s, transferred to the Gallery with the assistance of the heirs' lawyer.

*Adele Bloch–Bauer II* was sold in March 1943 to the Austrian Gallery.

*Houses in Unterach am Attersee* was kept by Dr. Führer for his personal collection. This painting was later retrieved from that collection by Plaintiff's brother. It was in possession of the heirs' Austrian lawyer in late 1940s and was returned to the Gallery in exchange for export licenses for other works of art.

The original disposition of *Amalie Zuckerkandl*[7] is not known; the painting eventually turned up in the hands of art dealer Vita Künstler, who donated it to the Gallery in 1988.

### 5. After the War

Ferdinand died just a few months after the war in Europe ended, but he took preliminary steps to retrieve his stolen property. Ferdinand made no bequest in his will to the Austrian Gallery.

In 1946, the Republic enacted a law declaring that all transactions that were motivated by discriminatory Nazi ideology were to be deemed null and void; however, the Republic often required the original owners of such property, including works of art, to repay to the purchaser the purchase price before an item would be returned.

Austrian law also prohibited the export of artworks that were deemed to be impor-

---

is not at issue in this action because Ferdinand donated it to the Gallery in 1936.

**6.** *Schloss Kammer am Attersee III* was later sold to Gustav Klimt's son. In 1961, this painting was donated to the Gallery.

**7.** Another Austrian family has asserted ownership rights to this painting as well.

tant to Austria's cultural heritage. It was the policy after the war to use the export license law to force Jews who sought export of artworks to trade artworks for export permits on other works.

### 6. Ferdinand's Heirs' Attempts to Secure the Paintings After the War

In 1947, a Swiss court recognized Plaintiff as the heir to 25% of Ferdinand's estate. The heirs retained an Austrian lawyer to attempt to secure return of Ferdinand's property. Plaintiff's older brother was a captain in the Allied Forces, and he personally recovered *Houses in Unterach am Attersee* from Dr. Führer's private collection. The painting was kept in his or his lawyer's apartment in Vienna pending permission to export the painting.

In February 1948, the Austrian lawyer sought return of *Adele Bloch–Bauer I, Adele Bloch–Bauer II,* and *Apple Tree I* from the Gallery. The Gallery asserted that five of the six paintings at issue were bequeathed to it by the will of Adele Bloch–Bauer in 1926, and that Ferdinand was merely granted permission to keep the paintings during his lifetime. The Gallery demanded the heirs return the remaining paintings to it.

### 7. The Museum's Actions In Protecting Its Collection

In March 1948, Dr. Garzarolli of the Austrian Gallery learned of the contents and probate proceedings of Adele's will. Specifically, Garzarolli learned that Adele had expressed the wish that Ferdinand donate the paintings to the Gallery, but that Adele had not herself bequeathed the paintings to the Gallery. Garzarolli acknowledged as much in a March 8, 1948, letter to his predecessor wherein Garzarolli expressed his concern at his predecessor's failure to obtain a declaration of gift in favor of the state from Ferdinand.[8] Dr. Garzarolli did not reveal to the heirs or their lawyers the files from Adele's probate proceedings that he had in his possession; rather, he prepared to sue the heirs for the remaining paintings.

### 8. The Exchange—Donations for Export Licenses

In late March 1948, Gallery officials reviewed the artwork in the apartment belonging to Plaintiff's brother or his lawyer to determine whether an export license could be granted. The officials recognized the pieces as part of Ferdinand's collection. Dr. Garzarolli sought the assistance of the Austrian Attorney General in obtaining possession of the remaining three paintings.

In early April, Dr. Garzarolli wrote to Dr. Otto Demus, president of the Federal Monument Agency (the agency in charge of the export licenses), and suggested that the processing of export permits for Ferdinand's collection be delayed "for tactical reasons." Dr. Demus met with the heirs'

---

8. An excerpt of this letter is set forth in ¶ 42 of the Complaint:

> Because there is no mention of these facts [the purported donation of the Klimt paintings by Adele or Ferdinand] in the available files of the Austrian Gallery, i.e., neither a court-authorized nor a notarized or other personal declaration of Ferdinand Bloch–Bauer exists, which in my opinion you certainly should have obtained, I find myself in an extremely difficult situation. . . . I cannot understand why even during the Nazi era

> an incontestable declaration of gift in favor of the state was never obtained from Ferdinand Bloch–Bauer. . . .
>
> In any case, the situation is growing into a sea snake ... I am very concerned that up until now all of the cases of restitution have brought with them immense confusion. In my opinion it would be also in your interest to stick by me while this is sorted out. Perhaps that way we will best come out of this not exactly danger-free situation.

lawyer regarding the artwork already in Austria and other items of artwork belonging to Ferdinand to be returned to Austria by the Allied forces. The lawyer understood from Dr. Demus that "donations" to the Gallery would have to occur in order to procure export licenses for any of Ferdinand's collection.

The lawyer, on behalf of the heirs,[9] agreed to "donate" the Klimt paintings in exchange for permits on the remaining items. The lawyer learned the contents of Adele's will, but thought Ferdinand's expressed intention to donate the Klimt paintings would be binding. The lawyer executed a document purporting to acknowledge the intention to donate the paintings expressed in Adele's will. The lawyer gave the Gallery *Houses in Unterach am Attersee* on April 12, 1948.

### 9. 1998 Discovery by Austrian Journalist

In 1998, after the seizure of two paintings by Egon Schiele in New York,[10] the Austrian federal minister opened up the Gallery's archives to permit researchers to prove that no looted artworks remained in Austria. Thereafter, an Austrian journalist, Hubertus Czernin, published a series of articles exposing the fact that Austria's federal museums had profited greatly from exiled Jewish families after the war.[11] *Adele Bloch–Bauer I*, reported by the Gallery as being donated to the Gallery in 1936, was revealed to have been transferred to the museum in 1941 with a letter from Dr. Führer signed "Heil Hitler." The archives were closed, but government research essentially confirmed Czernin's stories.

### 10. New Law Favoring Return of Artwork Stolen by Nazis

In response, in September 1998, a new restitution law was proposed in Austria, designed to return artworks that had been donated to federal museums under duress in exchange for export permits. The law was enacted in December.

A committee of government officials and art historians was formed by the new law,

9. Plaintiff was unaware of the attorney's actions until 1999. She did not authorize the attorney to negotiate on her behalf, nor did she authorize "donating" the paintings to the Gallery. Until 1999, Plaintiff believed that her family had donated the paintings to the Gallery. The Gallery's misrepresentations to the attorney were relayed to her brother, who later relayed them to her.

10. The painting *Portrait of Wally* by Egon Schiele was taken from its owner in Nazi-occupied Austria. *United States v. Portrait of Wally*, 105 F.Supp.2d 288 (S.D.N.Y.2000). At the end of World War II, the painting was recovered by Allied Forces and was returned to Austria to be returned to its rightful owner. *Id.* The painting was not ever returned to its owner. *Id.* In 2000, the painting, while on loan to the Museum of Modern Art in New York City, was seized pursuant to a seizure order issued by a United States magistrate judge pending proceedings under the National Stolen Property Act ("NSPA"), 18 U.S.C.

§ 2314, which prohibits transporting stolen goods in foreign commerce. *Id.* The court held that the painting could not be considered "stolen" under the NSPA once it was recovered by Allied Forces because the Allied Forces would be considered the owner's "agent" for purposes of the NSPA.

11. In January 1999, the Austrian government permitted Czernin to copy documents from the Gallery archives. Czernin provided copies of these documents to Plaintiff's lawyer, and Plaintiff learned how the Klimt paintings came to be in the possession of the Austrian Gallery.

California law recognizes that owners of stolen works of art are often unable immediately to file a cause of action for its recovery. *See Society of California Pioneers v. Baker*, 43 Cal.App.4th 774, 50 Cal.Rptr.2d 865 (1996); Cal.Code Civ. P. § 338 (establishing a three year statute of limitations that accrues upon the discovery of the whereabouts of a stolen article of artistic significance).

and in February 1999, the committee recommended that hundreds of artworks be returned to their rightful owners. In response to inquiries from the Austrian parliament, Minister Gehrer, Austria's federal minister of education and culture, concluded that there was an evident connection between the donation of the Klimt paintings and the export permit law.

There was political opposition to the return of the Klimt paintings. The committee received an incomplete report regarding the Klimts, and some members did not receive an expert's opinion regarding the invalidity of the purported bequest to the Gallery. On June 28, 1999, the committee met and affirmed a recommendation that the Klimts not be returned. The vote on the return of the paintings was predetermined, and one member of the committee eventually resigned in protest. The committee did vote to return 16 Klimt drawings and 19 porcelain settings previously donated by the family in exchange for export permits.

Plaintiff protested the committee's decision and requested arbitration. The Republic rejected this approach, suggesting that the heirs' only remedy was to go to court.

### 11. Attempt at Austrian Judicial Intervention

In September 1999, Plaintiff announced she would file a lawsuit regarding the paintings. However, the court costs associated with bringing such a suit in Austria are determined by the amount in controversy. Plaintiff would have to pay a filing fee of approximately two million Austrian Schillings [12] for the privilege of suing the Republic and the Gallery even after obtaining a partial waiver of court costs. The Austrian Court noted the amount of Plaintiff's assets and suggested that Plaintiff should spend all of her liquid assets in furtherance of her claim because the alternative would be to charge the court costs to the Austrian public.

### B. Factual Allegations Regarding Jurisdiction [13]

The Gallery publishes a museum guidebook in English available for purchase by United States citizens. The Gallery has lent *Adele Bloch–Bauer I* to the United States in the past.

The Gallery is visited by thousands of United States citizens each year. The Gallery's collection, including the paintings at issue in this action, is advertised in the United States.

The Republic has a consular office in Los Angeles. The Republic promotes Austrian filmmakers in the United States. The Republic owns real property in Los Angeles.

---

12. The current exchange rate of Austrian Schillings to United States Dollars is approximately 15:1. In today's terms the filing fee would be approximately $133,000. In October 1999, when Plaintiff filed her request for assistance, the Austrian Schilling was stronger against the United States dollar, so the filing fee was slightly higher. According to Plaintiff, the exchange rate in October 1999 was 10:1, and the filing fee would have been $200,000. Nevertheless, regardless of the exchange rate used, the filing fee is quite substantial.

13. Plaintiff also makes allegations regarding the activities of the National Tourist Office in United States. These allegations may not be used to assert jurisdiction over the Republic or the Gallery. *See* 28 U.S.C. § 1605(a)(3) (applying expropriation exception to FSIA when expropriated property is owned or operated by an agency or instrumentality of the foreign state when *that* agency or instrumentality is engaged in commercial activity in the United States).

## C. Plaintiff's Claims

Plaintiff seeks recovery under a variety of causes of action. Her first cause of action is for declaratory relief pursuant to 28 U.S.C. § 2201; Plaintiff seeks a declaration that the Klimt paintings should be returned pursuant to the 1998 Austrian law. Plaintiff's second cause of action is for replevin, presumably under California law; Plaintiff seeks return of the paintings. Plaintiff's third cause of action seeks rescission of any agreements by the Austrian lawyer with the Gallery or the Federal Monument Agency due to mistake, duress, and/or lack of authorization. Plaintiff's fourth cause of action seeks damages for expropriation and conversion, and her fifth cause of action seeks damages for violation of international law. Plaintiff's sixth cause of action seeks imposition of a constructive trust, and her seventh cause of action seeks restitution based on unjust enrichment. Finally, Plaintiff's eighth cause of action seeks disgorgement of profits under the California Unfair Business Practices law.

## D. The Present Motion

Defendants argue that they are immune from suit under the doctrine of sovereign immunity, and that the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1601, *et seq.*, does not strip them of this immunity. Defendants also argue that the Court should decline to exercise jurisdiction over the present dispute under the doctrine of *forum non conveniens*, that the action should be dismissed for Plaintiff's failure to join indispensable parties under Fed.R.Civ.P. 19, and that venue in the Central District of California is improper.

Plaintiff argues that Defendants are subject to the Foreign Sovereign Immunities Act, but that the expropriation exception to sovereign immunity is applicable to Defendants. Plaintiff also argues that even if Defendants are not subject to the FSIA, they are required to return the paintings under international and Austrian law. Plaintiff argues that the Court should not apply the doctrine of *forum non conveniens* because no reasonable alternative forum is available. Plaintiff also argues that dismissal is not required under Fed.R.Civ.P. 19 because Plaintiff has received assignments of rights from other parties with interest in the paintings and because, in the absence of an alternative forum, it would be unjust to dismiss the present action. Finally, Plaintiff argues that venue is appropriate in the Central District because Defendants have failed to deliver the paintings to her within the district and because Defendants do business within the district.

## II. Subject Matter Jurisdiction— The Applicability of the Foreign Sovereign Immunities Act

### A. Rule 12(b)(1) Standard

A motion to dismiss an action for lack of subject matter jurisdiction is properly brought under Fed.R.Civ.P. 12(b)(1). The objection presented by this motion is that the Court has no authority to hear and decide the case. When considering a Rule 12(b)(1) motion challenging the substance of jurisdictional allegations, the Court is not restricted to the face of the pleadings, but may review any evidence, such as declarations and testimony, to resolve any factual disputes concerning the existence of jurisdiction. See *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir.1988).

### B. Foreign Sovereign Immunities Act—General Rule

The FSIA is the sole basis for jurisdiction over a foreign state and its agencies and instrumentalities. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434, 109 S.Ct. 683, 102

L.Ed.2d 818 (1989). Under the FSIA, foreign states are presumed to be immune from the jurisdiction of the United States courts unless one of the FSIA's exceptions applies. 28 U.S.C. § 1604.

### C. Burden of Proof Under FSIA

■ If a plaintiff's allegations and uncontroverted evidence establish that an FSIA exception to immunity applies, the party claiming immunity bears the burden of proving by a preponderance of the evidence that the exception does not apply. *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699 (9th Cir.1992), *cert. denied*, 507 U.S. 1017, 113 S.Ct. 1812, 123 L.Ed.2d 444 (1993).

### D. Applicability of FSIA to pre–1952 Events

#### 1. The Tate Letter

Until 1952, foreign states and their agencies and instrumentalities were absolutely immune from suit in United States courts. *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 486, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983); *Siderman de Blake*, 965 F.2d at 705. In 1952, the Acting Legal Adviser of the State Department, Jack Tate, sent a letter ("the Tate Letter") to the Acting Attorney General announcing that the State Department was adopting the restrictive principle of foreign sovereign immunity. *Verlinden*, 461 U.S. at 487, n. 9, 103 S.Ct. 1962. Under the restrictive principle of sovereign immunity, the immunity of a foreign sovereign is recognized with regard to a sovereign's public acts (*jure imperii*), but is not recognized with respect to a sovereign's private acts (*jure gestionis* ). *Siderman de Blake*, 965 F.2d at 705 (citations omitted).

■ The Tate Letter, while announcing this new policy, did not provide courts with concrete standards for determining wheth-

er to assert jurisdiction over suits against foreign states. *Id.* In 1976, with the passage of the FSIA, Congress provided such standards. *Id.* The FSIA codified the restrictive theory of sovereign immunity and conferred subject matter jurisdiction over claims against foreign sovereigns on the United States courts. *Id.;* H.R.Rep. No. 1487, 94th Cong., 2d Sess., *reprinted in* 1976 U.S.Code & Admin. News at 6613.

#### 2. Defendant's Position—FSIA Does Not Apply to Pre–1952 Events

Defendants argue that because the FSIA was meant to codify the restrictive principle of sovereign immunity, and because this policy was not was adopted until 1952, the FSIA is not applicable to actions that occurred prior to 1952. Defendants contend, therefore, that they are entitled to absolute sovereign immunity in accordance with the State Department's policy prior to the issuance of the Tate Letter. Defendants' position is not without support.

The Eleventh Circuit first considered this issue in 1986. *See Jackson v. People's Republic of China*, 794 F.2d 1490 (11th Cir.1986), *cert. denied*, 480 U.S. 917, 107 S.Ct. 1371, 94 L.Ed.2d 687 (1987). At issue in *Jackson* were claims regarding bearer bonds issued by the Imperial Government of China in 1911 that were to mature in 1951. *Id.* at 1497. The Eleventh Circuit affirmed the district court's holding that the FSIA did not confer jurisdiction for actions prior to the issuance of the Tate Letter. *Id.* The Eleventh Circuit reasoned that courts normally presume that legislative enactments are to apply prospectively, and that there was no reason to deviate from this presumption because the FSIA was not intended to affect the substantive law of liability. *Id.* The Eleventh Circuit agreed with the district court's reasoning that to apply the FSIA

to pre–1952 events would interfere with China's established expectations of absolute immunity. *Id.* Therefore, the Eleventh Circuit concluded, the FSIA did not apply to pre–1952 events. *Id.* at 1499.

In 1985, the District Court for the District of Columbia relied on *Jackson* and held that the FSIA did not apply to a claim based on a 1922 agreement between the plaintiff and the United States of Mexico. *Slade v. United States of Mexico,* 617 F.Supp. 351, 356 (D.D.C.1985). The district court in *Slade,* like the Eleventh Circuit in *Jackson,* reasoned that the presumption of prospective application of legislative enactments supported Mexico's position that the FSIA did not apply to pre–1952 events. *Id.* at 356. The *Slade* court also had the same concerns as the *Jackson* court regarding interfering with the foreign sovereign's established expectations of absolute immunity. *Id.* at 357. Later, in 1993, the District Court for the District of Columbia again held, relying on *Jackson* and *Slade,* that the FSIA was inapplicable to pre–1952 events. *Djordjevich v. Bundesminister Der Finanzen, Federal Republic of Germany,* 827 F.Supp. 814 (D.D.C.1993). This case was affirmed by the District of Columbia Circuit on other grounds.

In 1988, the Second Circuit relied on *Jackson* and *Slade* and held that the Union of Soviet Socialist Republics ("USSR") was absolutely immune from claims based on debt instruments issued by the Russian Imperial Government in 1916 because the claims arose prior to the issuance of the Tate Letter. *Carl Marks & Co. v. Union of Soviet Socialist Republics,* 841 F.2d 26, 27 (2d Cir.1988), *cert. denied,* 487 U.S. 1219, 108 S.Ct. 2874, 101 L.Ed.2d 909 (1988). The Court noted that a retroactive application of the FSIA would adversely affect the USSR's settled expectation of

immunity from suit in the United States courts. *Id.*

■ Although the Defendants' position on the FSIA's applicability to pre–1952 events is supported by case law, the continued viability of these cases is in doubt in light of the United States Supreme Court's subsequent decision in *Landgraf v. USI Film Products,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). *Landgraf,* as well as cases decided after *Landgraf* regarding the FSIA's application to pre–1952 events, lead the Court to conclude that the FSIA applies to pre–1952 events.

### E. *Landgraf v. USI Film Products, Inc.*

■ In *Landgraf,* the United States Supreme Court held that in determining whether to apply a legislative enactment to events that occurred prior to the enactment, a court must first consider whether Congress expressly stated the statute's reach. *Landgraf,* 511 U.S. at 280, 114 S.Ct. 1483. If Congress has made no expression of its intent, the court must then determine whether, if applied to events that preceded the enactment's effective date, the statute would have a "retroactive effect"; i.e., whether it would impair rights a party possessed when he acted, impose new duties on a party, or increase a party's liability for past conduct. *Id.* Statutes conferring jurisdiction generally do not have a retroactive effect. *Id.* at 274 ("We have regularly applied intervening statutes conferring or ousting jurisdiction, whether or not jurisdiction lay when the underlying conduct occurred or when the suit was filed"). "Application of a new jurisdictional rule usually 'takes away no substantive right but simply changes the tribunal that is to hear the case.'" *Id.* (citation omitted). The *Landgraf* case noted the tension between two principles of statutory interpretation. The first principle is that normally a court is to apply the law in effect

at the time it renders a decision. *Id.* at 264, 114 S.Ct. 1483. The second principle is that cited by the *Jackson, Carl Marks,* and *Slade* cases: Retroactivity of legislative enactments is not favored in the law. *Landgraf,* 511 U.S. at 264, 114 S.Ct. 1483. In its discussion of retroactive application of jurisdictional statutes, the Supreme Court noted that the first principle—application of present law—is the most relevant. "Present law normally governs in such situations because jurisdictional statutes 'speak to the power of the court rather than the rights or obligations of the parties.'" *Id.* (citation omitted). Thus, the Supreme Court rejected the rationale that was employed by the *Jackson, Carl Marks,* and *Slade* courts in situations involving the question of retroactivity of jurisdictional statutes. In these situations, the Supreme Court favors applying the law in effect at the time of the decision.

The FSIA does not affect any substantive law determining the liability of a foreign state or instrumentality. *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba,* 462 U.S. 611, 620, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983). *See also* H.R.Rep. No. 94-1487 (1976), *reprinted in* 1976 U.S.Code Cong. & Admin. News at 6610 ("The bill is not intended to affect the substantive law of liability.").[14] This favors applying the FSIA to pre-1952 events. *See Jeffries v. Wood,* 114 F.3d 1484 (9th Cir.) (en banc) (noting that *Landgraf* identified statutes that confer or

---

14. *But see Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983). The *Verlinden* Court rejected a constitutional challenge to the FSIA and held that a claim brought pursuant to the FSIA "arises under" federal law as that term is used in Article III of the United States Constitution. In arriving at this conclusion, the Court noted that the FSIA is more than a mere jurisdictional statute:

> As the House Report clearly indicates, the primary purpose of the act was to "set forth comprehensive rules governing sovereign immunity" ...; the jurisdictional provisions of the Act are simply one part of this comprehensive scheme. The Act thus does not merely concern access to the federal courts. Rather, it governs the types of actions for which foreign sovereigns may be held liable in a court in the United States, federal or state. The Act codifies the standards governing foreign sovereign immunity as an aspect of substantive federal law, ... and applying those standards will generally require interpretation of numerous points of federal law.

*Id.* at 496–97, 103 S.Ct. 1962 (citations omitted). At first glance, the above-quoted passage from *Verlinden* seems at odds with *First Nat'l City Bank*'s pronouncement that the FSIA was not intended to affect the substantive law determining the liability of a foreign state. These cases, however, were decided in the same session of the United States Supreme Court, and were issued within one month of each other. *See Verlinden,* 461 U.S. at 480, 103 S.Ct. 1962 (1983); *First Nat'l City Bank,* 462 U.S. at 611, 103 S.Ct. 2591 (1983). Presumably, therefore, any inconsistencies between the two decisions would have been resolved prior to the issuance of *First Nat'l City Bank.* A closer reading of *Verlinden* leads the Court to the conclusion that there is no inconsistency between the two decisions.

The *Verlinden* Court reasoned that the FSIA was within Congress' Article I power to regulate foreign commerce, and that the FSIA was within the Article III limitations on the power of the judiciary because claims against foreign sovereigns would necessarily arise under federal law.

> Congress, pursuant to its unquestioned Article I powers, has enacted a broad statutory framework governing assertions of foreign sovereign immunity. In so doing, Congress deliberately sought to channel cases against foreign sovereigns away from the state courts and into the federal courts, thereby reducing the potential for a multiplicity of conflicting results among the courts of the 50 states. *The resulting jurisdictional grant is within the bounds of Article III, since every action against a foreign sovereign, necessarily involves application of a body of substantive federal law, and accordingly "arises under" federal law, within the meaning of Article III.*

*Id.* at 497, 103 S.Ct. 1962 (emphasis added).

oust jurisdiction as an example of statutes that generally do not have a retroactive effect), *cert. denied*, 522 U.S. 1008, 118 S.Ct. 586, 139 L.Ed.2d 423 (1997). Other courts that have, after *Landgraf*, considered the applicability of the FSIA to pre–1952 events have suggested or concluded that the FSIA should apply to pre–1952 events. In 1994, the District of Columbia Circuit addressed the issue in *Princz v. Federal Republic of Germany*, 26 F.3d 1166 (D.C.Cir.1994), *cert. denied*, 513 U.S. 1121, 115 S.Ct. 923, 130 L.Ed.2d 803 (1995). There, the court noted that there is a strong argument in favor of applying the FSIA to pre–1952 events. *Id.* at 1170. The FSIA provides that "[c]laims of foreign states to immunity should **henceforth be decided** by courts of the United States . . . **in conformity with the principles set forth in this chapter.**" 28 U.S.C. § 1602 (emphasis added). This language, the *Princz* court stated, suggests that the FSIA is to be applied to all cases decided after its enactment regardless of when the plaintiff's cause of action may have accrued. *Princz*, 26 F.3d at 1170. The *Princz* court also noted that this result is supported by *Landgraf* because the FSIA is a jurisdictional statute that does not alter substantive legal rights.[15] *Id.* at 1171.

Later, in 1999, the District of Columbia Circuit held that a 1988 amendment to the FSIA could be applied to events preceding the amendment's enactment. *Creighton Limited v. Government of the State of Qatar*, 181 F.3d 118 (D.C.Cir.1999). The court reasoned that the amendment was jurisdictional in nature and that therefore, under *Landgraf*, could be applied under the principle of statutory interpretation requiring the court apply the law in effect at the time it renders a decision. *Id.* at 124.

A district court in the Northern District of Illinois relied on *Princz* and *Creighton* and held that the FSIA could be applied to pre–1952 events. *Haven v. Rzeczpospolita Polska (Republic of Poland)*, 68 F.Supp.2d 943, 945 (N.D.Ill.1999) (denying Poland's motion to dismiss claims based on allegations of expropriation of real property during and shortly after World War II). Although the *Haven* court noted that the determination of whether to apply the FSIA to pre–1952 events was a difficult question to resolve, the court noted that the post-*Landgraf* cases of *Princz* and *Creighton* were more persuasive than the pre-*Landgraf* cases of *Jackson* and *Carl Marks*. This Court agrees.

For these reasons, the Court holds that the FSIA applies to pre–1952 events.[16]

---

**15.** Defendants correctly note that *Lin v. Government of Japan*, No. 92–2574, 1994 WL 193948 (D.D.C.1994), held that the FSIA should not be applied to pre–1952 events. The *Lin* court explicitly noted that *Landgraf* did not require a contrary result. *Id.* at *12. However, *Lin* is not persuasive for two reasons. First, the decision itself is not a published decision and is therefore of little precedential value in light of the District of Columbia Circuit's Rule 28(c), which prohibits the citation of this case as precedent to the District of Columbia. Second, *Lin* was decided before *Princz* and *Creighton*, in which the District of Columbia Circuit noted that, under *Landgraf*, application of the FSIA to pre–1952 events is appropriate.

**16.** Both parties seem to assume that only pre–1952 conduct is at issue in this action. Indeed, the conduct of Gallery officials in the late 1940s is relevant, but other conduct—well after 1952—is at issue as well. Plaintiff's claims include allegations that Austria concealed the true ownership of the paintings from her and the other heirs even after 1952. The expropriation exception to foreign sovereign immunity concerns *itself* with property taken in violation of international law, rather than the taking of property in violation of international law. *See infra*, section III.F.2. These post–1952 acts also establish jurisdiction under the expropriation exception to foreign sovereign immunity.

### F. Expropriation Exception to Sovereign Immunity

#### 1. An Exception of the FSIA Must Apply

Even though the FSIA applies to pre-1952 events, one of the exceptions to the FSIA's general rule of immunity must apply, or Austria is entitled to sovereign immunity. Plaintiff claims that the "expropriation exception" to the FSIA applies. *See* 28 U.S.C. § 1605(a)(3). That exception provides:

> (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case ...(3) in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States
> ....

*Id.*

This exception has two distinct clauses, separated by a semi-colon. *See* H.R.Rep. No. 1487, 94th Cong., 2d Sess., *reprinted in* 1976 U.S.Code & Admin. News at 6613. The first clause "involves cases where the property in question or any property exchanged for such property is present in the United States." *Id.* Because the Klimt paintings are not present in the United States, the first clause does not apply.

The second clause involves cases in which "the property, or any property exchanged for such property, is (i) owned or operated by an agency or instrumentality of a foreign state and (ii) that agency or instrumentality is engaged in commercial activity in the United States. Under the second [clause], the property need not be present [in the United States] in connection with a commercial activity of the agency or instrumentality." *Id.*

This exception has three distinct requirements. First, there must be property taken in violation of international law—i.e., the property must have been expropriated. Second, the property must be "owned or operated by an agency of or instrumentality of a foreign state ...." Finally, the agency or instrumentality must be engaged in commercial activity in the United States.

#### 2. Property Must Be Taken In Violation of International Law

At the jurisdictional stage, a court need not determine if property was taken in violation of international law; so long as the plaintiff's claims are substantial and non-frivolous, there is a sufficient basis for the exercise of the court's jurisdiction. *Siderman de Blake,* 965 F.2d at 711. The foreign state against whom a claim is made need not be the sovereign that expropriated the property at issue. *See* 28 U.S.C. § 1605(a)(3) (excepting claims regarding property "taken in violation of international law" rather than excepting claims against foreign states that have taken property in violation of international law).

There are three requisites to a valid taking under international law. *Id.* First, the taking must serve a public purpose; second, aliens must not be discriminated against or singled out for regulation by the state; and third, payment of just compensation must be made. *Id.* at 711–12.

Here, Plaintiff's allegations establish a substantial and non-frivolous

claim that a taking in violation of international law occurred on at least two occasions. First, the Nazi "aryanization" of Ferdinand's art collection by the Nazis is undeniably a taking in violation of international law. The taking was not for public purpose; instead, some of the art was distributed to the collections of Hitler, Göring, and Dr. Fürher. Other art was sold for the benefit of the Nazi party.[17] Moreover, the Nazi's aryanization of art collections was part of a larger scheme of the genocide of Europe's Jewish population, and it requires no semantic stretch to characterize this program as singling out "aliens" for regulation by the state. Finally, no payment of just compensation was made as a result of this taking.

Next, Plaintiff has established a substantial and non-frivolous claim that a taking in violation of international law occurred when the paintings were "donated" to the Gallery in 1948 in order to secure export licenses for other works of art. These paintings were not taken for a public purpose; Austria's own laws required their return to their rightful owners. Moreover, Austria's acknowledged practice of requiring export licenses for works of art stolen by the Nazis singled out aliens for regulation by the state because aliens would be much more likely to seek export of these artworks than would Austrian citizens. Additionally, because Austria's laws required the return of these artworks to their rightful owners, the exchange of certain works of art for export permits on other works of art cannot be viewed as just compensation.

Therefore, Plaintiff has made out a substantial and non-frivolous claim that these works of art were taken in violation of international law.

 Defendants argue that Plaintiff must first exhaust her domestic remedies regarding her claims for the artworks before seeking the intervention of the United States courts. A plaintiff cannot complain that a taking has not been fairly compensated unless the plaintiff has first pursued and exhausted the domestic remedies in the foreign state that is alleged to have caused the injury. *Greenpeace, Inc. v. State of France*, 946 F.Supp. 773, 783 (C.D.Cal.1996). However, this exhaustion requirement is excused when the domestic remedies are a sham, are inadequate, or would be unreasonably prolonged. Restatement (Third) of Foreign Relations Law, § 713, cmt. f (1986). For the reasons stated below in section IV, regarding the doctrine of *forum non conveniens*, the Court finds that the Austrian courts provide an inadequate forum for resolution of Plaintiff's claims.

For these reasons, Plaintiff's claim meets the "taking" requirement of the expropriation exception of the FSIA.

### 3. Property Must Be Owned or Operated by Agency or Instrumentality of a Foreign State

 The FSIA defines an "agency or instrumentality of a foreign state" as any entity that is a separate legal person, that is an organ of a foreign state, and that is not a citizen of the United States or created under the laws of any third country.

---

17. Nazi Germany is not recognized as a valid foreign sovereign. *See Weiss v. Lustig*, 185 Misc. 910, 58 N.Y.S.2d 547 (1945) (refusing to recognize Nazi decree as the law of a sovereign state); *Kalmich v. Bruno*, 450 F.Supp. 227 (N.D.Ill.1978) (holding that the act of state doctrine did not apply to actions of Nazi occupation forces in Yugoslavia because this doctrine applies only to the acts of a sovereign in its own territorial jurisdiction and not to the acts of belligerent force, during wartime, in an occupied territory of an enemy nation).

Until January 1, 2000, the Gallery was an agency or instrumentality of a foreign state. On January 1, 2000, the Gallery was privatized and is no longer an organ of the Republic. Nevertheless, this change in the structure of the Gallery's operations does not divest this Court of subject matter jurisdiction because the events in question occurred prior to the Gallery's privatization. *See Delgado v. Shell Oil Co.,* 890 F.Supp. 1324 (S.D.Tex.1995) (holding that jurisdiction under the FSIA over an Israeli company was appropriate where Israel owned a majority of shares of the company when plaintiffs were injured by the company's products even though subsequent changes in ownership resulted in the company no longer being considered "an agency or instrumentality" of Israel).

The paintings are owned by the Republic, but are exhibited by the Gallery. The exhibition of these paintings fulfills the "owned or operated by an agency or instrumentality" requirement. *See, e.g., Siderman de Blake,* 965 F.2d at 712.

Therefore, Plaintiff's claim meets the "owned or operated" requirement of the expropriation exception of the FSIA.

### 4. The Agency or Instrumentality Must Be Engaged in Commercial Activity

■ Finally, the agency or instrumentality must be engaged in commercial activity in the United States. "Commercial activity" is defined by the FSIA as "either a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d). "The commercial character of an activity [is] determined by reference to the nature of the course of

conduct of a particular transaction or act, rather than by reference to its purpose." *Id.* "[W]hen a foreign government acts ... in a manner of a private player within [the market], the foreign sovereign's acts are "commercial" within the meaning of the FSIA." *Republic of Argentina v. Weltover, Inc.,* 504 U.S. 607, 614, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992) (holding that the issuance of bonds by the Republic of Argentina was a "commercial activity" within the meaning of the FSIA). In determining whether a sovereign's acts are commercial, the focus of the inquiry is not whether the sovereign acts with a profit motive; "[r]ather, the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in trade and traffic or commerce." *Id.* (citations and internal quotation marks omitted; emphasis in the original). Therefore, while a sovereign's issuance of regulations limiting foreign currency exchange is a sovereign activity (because a private party could not ever exercise this authority), a contract by a sovereign to buy army boots or weapons is a commercial activity (because private companies can contract to acquire goods). *Id.*

■ Therefore, the issue before the court is whether the type of actions engaged in by the Gallery in the United States constitutes "commercial activity." [18] According to the allegations in the Complaint, the Gallery publishes a museum guidebook in English available for purchase by United States citizens, including those in the Central District, and the Gallery's collection, including the paintings at issue in this action, is advertised in the

---

18. The language of § 1605(a)(3) seems to limit the Court's inquiry to the nature of the activities of the agency or instrumentality, rather than to the sovereign *and* its agencies or instrumentalities. However, because the Court concludes that the Gallery engages in commercial activity within the meaning of the FSIA, the Court need not decide today whether this exception is so limited.

United States, including in the Central District. Moreover, the Gallery is visited by thousands of United States citizens each year, including United States citizens that reside in the Central District. Additionally, the Gallery has lent *Adele Bloch–Bauer I* to the United States in the past.

Plaintiff argues that operating a museum is an activity in which private parties engage. Indeed, the privatization of the Gallery in January 2000 bears out this argument. *Cf. Aschenbrenner v. Conseil Regional de Haute–Normandie*, 851 F.Supp. 580, 584 (S.D.N.Y.1994) (holding that an art exposition was not a "commercial activity" within the meaning of the FSIA). Plaintiff's argument is well-founded, even though the Gallery itself operates on foreign soil. In *Siderman de Blake,* the Ninth Circuit held that a government-expropriated hotel's solicitation of American guests, the hotel's entertainment of those guests, and the acceptance of payment from credit cards and traveler's checks of those guests was sufficient commercial activity to confer jurisdiction under the FSIA. *Siderman de Blake*, 965 F.2d at 712. The Court concludes that under *Siderman de Blake,* the Gallery engages in commercial activity under the FSIA.

The Gallery also engages in commercial activity by publishing its guidebook that is available for purchase in the United States. *See Aschenbrenner,* 851 F.Supp. at 584 (suggesting that publication of a book containing photographs of an artist's works was a commercial activity). The Gallery also engages in commercial activity by advertising in the United States. *See Holden v. Canadian Consulate,* 92 F.3d 918 (9th Cir.1996) (holding that promotion of products in the United States by an employee hired by a foreign sovereign constituted commercial activity because private parties engage in product promotion), *cert. denied,* 519 U.S. 1091, 117 S.Ct. 767, 136 L.Ed.2d 713 (1997).

Defendants argue that even if the Gallery engages in commercial activity, the Court still does not have jurisdiction over the Republic. Defendant's argument is based on the assumption that the Court may exercise jurisdiction over a foreign sovereign under only the first clause of the expropriation exception, which requires that the property be present in the United States and which is inapplicable to the present claims.

This argument, however, ignores the language of § 1605(a). All the enumerated exceptions to the FSIA in § 1605(a) clearly relate to when a court may exercise jurisdiction over a foreign state. Section 1605(a) begins with the clause "(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case …," and then goes on to list a number of circumstances in which sovereign immunity is inapplicable. The second clause of § 1605(a)(3) should be read in the disjunctive, so that a foreign state shall not be immune when expropriated property is owned or operated by the foreign state's agency or instrumentality when that agency or instrumentality engages in commercial activity in the United States. Defendants' reading of the second clause of § 1605(a)(3), limiting immunity to the agency or instrumentality, is not consistent with the language of the statute or its legislative history.[19]

For these reasons, the Court concludes that the expropriation exception to the

**19.** Moreover, the FSIA defines a "foreign state" as including its agencies and instru- mentalities. *See* 28 U.S.C. § 1603(a).

FSIA applies to Plaintiff's claims, and Austria is not entitled to immunity.

### III. Personal Jurisdiction

Defendants also argue that even if an exception to sovereign immunity applies, Plaintiff's suit still cannot be maintained unless the Court has personal jurisdiction over the Republic and the Gallery.

The legislative history of the FSIA reveals that the intent of Congress was that if one of the FSIA exceptions to immunity existed, the constitutional due process requirements of personal jurisdiction were satisfied. H.R.Rep. No. 1487, 94th Cong., 2d Sess., *reprinted in* 1976 U.S.Code & Admin. News at 6613 ("Significantly, each of the immunity provisions in the bill, sections 1605–1607, requires some connection between the lawsuit and the United States. These immunity provisions, prescribe the necessary contacts which must exist before our courts can exercise personal jurisdiction.")

Until 1992, Ninth Circuit authority had suggested that the Court would be required in a case involving FSIA to engage in a "minimum contacts" analysis. *See Siderman de Blake*, 965 F.2d at 704 n. 4 ("[T]he exercise of personal jurisdiction also must comport with the constitutional requirement of due process"); *Gregorian v. Izvestia*, 871 F.2d 1515 (9th Cir.1989) ("[I]f defendants are not entitled to immunity under the FSIA, a court must consider whether the constitutional constraints of the Due Process Clause preclude the assertion of personal jurisdiction over them."), *cert. denied*, 493 U.S. 891, 110 S.Ct. 237, 107 L.Ed.2d 188 (1989). Later case law, decided after the United State Supreme Court's decision in *Weltover*, suggests a different approach. In *Weltover*, the Court explicitly declined to decide whether a foreign state is a "person" under the Due Process Clause because it found that due process had been satisfied.

The Court cited to *Carolina v. Katzenbach*, 383 U.S. 301, 323–24, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966), which held that States of the Union are not "persons" for purposes of the Due Process Clause. This citation suggests that the Court, in a case that properly presents the issue, would hold that foreign sovereigns are not entitled to due process protection.

Other courts, including the Ninth Circuit, have since explicitly declined to decide whether foreign sovereigns are "persons" under the Due Process Clause. *Theo. H. Davies & Co., Ltd. v. Republic of the Marshall Islands*, 174 F.3d 969 (9th Cir.1998); *S & Davis Int'l, Inc. v. The Republic of Yemen*, 218 F.3d 1292 (11th Cir.2000); *Hanil v. PT. Bank Negara Indonesia*, 148 F.3d 127, 130 (1998). In *Theo. H. Davies*, in light of the suggestion in *Weltover* that foreign sovereigns are not "persons" for purposes of the Due Process Clause, the Ninth Circuit significantly altered its previous approach and assumed, but did not decide, that foreign states are entitled to due process protection. *Theo. H. Davies*, 174 F.3d at 975 n. 3 (citing *Weltover*).

Many courts considering whether they had personal jurisdiction over a foreign sovereign since *Weltover* have not been required to determine if the Due Process Clause applies to foreign sovereigns because those courts have been able to conclude without much analysis that due process has been satisfied. *See Theo. H. Davies*, 174 F.3d at 974–76; *Republic of Yemen*, 218 F.3d at 1303; *Hanil*, 148 F.3d at 130. This is because the more commonly employed exception to foreign sovereign immunity under the FSIA, the commercial activity exception, requires that the action be based on commercial activity carried on in the United States, connected with the United States, or that has a direct effect on the United States.

*See* 28 U.S.C. § 1605(a)(2). When these requirements have been met, courts have been able to conclude that they have personal jurisdiction over the foreign sovereign by virtue of these contacts with the United States and that therefore the due process requirements for personal jurisdiction have been satisfied. *See Theo. H. Davies,* 174 F.3d at 974–76; *Republic of Yemen,* 218 F.3d at 1303; *Hanil,* 148 F.3d at 130.

 It is less clear whether sufficient activity to satisfy the expropriation exception to foreign immunity would also satisfy due process. However, such an analysis is not required because foreign sovereigns are not "persons" for purposes of the Due Process Clause. As previously noted, Ninth Circuit case law prior to *Weltover,* by requiring a "minimum contacts" analysis, had implicitly held that foreign sovereigns are "persons" entitled to due process. *See Siderman de Blake,* 965 F.2d at 704 n. 4; *Gregorian v. Izvestia,* 871 F.2d 1515. The Ninth Circuit has since retreated from this implicit holding by following the *Weltover* court's lead in assuming without deciding that due process was satisfied. *Theo. H. Davies,* 174 F.3d at 975 n. 3 (citing *Weltover* ).

The District Court for the District of Columbia has considered this issue in depth and has concluded that foreign sovereigns are not "persons" within the meaning of the Due Process Clause. *See Flatow v. Islamic Republic of Iran,* 999 F.Supp. 1 (D.D.C.1998); *World Wide Minerals, Ltd. v. Republic of Kazakhstahn,* 116 F.Supp.2d 98 (D.D.C.2000) (following *Flatow* ); *Daliberti v. Republic of Iraq,* 97 F.Supp.2d 38, 49 (D.D.C.2000) (following *Flatow* and noting that it would seem that a foreign sovereign should enjoy no greater due process rights than the sovereign states of the union). This Court finds the *Flatow* court's rationale persuasive.

The *Flatow* court first noted that most courts have simply assumed without deciding that a foreign sovereign is a "person" for purposes of constitutional due process analysis and that this assumption has rarely been examined in depth. *Flatow,* 999 F.Supp. at 19. The *Flatow* court cited *Afram Export Corp. v. Metallurgiki Halyps, S.A.,* 772 F.2d 1358, 1362 (7th Cir. 1985), which noted that an unexamined assumption regarding the ability of foreign corporations to object to extraterritorial assertions of personal jurisdiction was probably now "too solidly entrenched" to be questioned. The *Flatow* court rejected the notion that the unexamined assumption with which it was faced could not be questioned. So, too, does this Court.

The United States Supreme Court has held that a State of the United States is not entitled to substantive due process. *Katzenbach,* 383 U.S. at 323–24, 86 S.Ct. 803. Similarly, the United States Supreme Court has noted that "in common usage, the term 'person' does not include the sovereign, and statutes employing the word are ordinarily construed to exclude it." *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 64, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) (internal alterations and citations omitted); *see also Rios v. Marshall,* 530 F.Supp. 351, 372 (S.D.N.Y.1981) (holding that foreign states are not "persons" subject to antitrust liability under the Sherman Act).

Several courts have held that the federal government, state governments, political subdivisions and municipalities within the United States are not "persons" within the meaning of the Due Process Clause. *See In re Herndon,* 188 B.R. 562, 565 n. 8 (Bkrtcy.E.D.Ky.1995) ("The Fifth Amendment accords due process of law to persons. A governmental entity is not a 'person.' The Fifth Amendment protects persons from the government; its does

not necessarily protect one branch of the government from the actions of another branch."); *El Paso County Water Imp. Dist. No. 1 v. International Boundary and Water Comm'n*, 701 F.Supp. 121 (W.D.Tex.1988); *City of Sault Ste. Marie, Mich. v. Andrus*, 532 F.Supp. 157 (D.D.C. 1980); *State of Oklahoma v. Federal Energy Regulatory Comm'n*, 494 F.Supp. 636 (D.C.Okla.1980), *aff'd on other grounds*, 661 F.2d 832 (10th Cir.1981), *cert. denied sub nom., Texas v. Federal Energy Regulatory Comm'n*, 457 U.S. 1105, 102 S.Ct. 2902, 73 L.Ed.2d 1313 (1982).

The personal jurisdiction requirement recognizes an individual liberty interest that is conferred by the Due Process Clause. *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982). The personal jurisdiction requirement represents a restriction on judicial power not as a matter of sovereignty, but as a matter of individual liberty. *Id.* "It would be illogical to grant this personal liberty interest to foreign states when it has not been granted to federal, state or local governments of the United States." *Flatow*, 999 F.Supp. at 21. Accordingly, this Court holds that a foreign state is not a "person" under the Due Process Clause of the United States Constitution.

 The previously-cited House Report's language is unambiguous—it states that *in personam* jurisdiction has been addressed within the requirements of the statute; the FSIA does not grant a liberty interest for the purposes of substantive due process analysis. H.R.Rep. No. 1487, 94th Cong., 2d Sess., *reprinted in* 1976 U.S.Code & Admin. News at 6611–12. This Court joins with the *Flatow* court's observation that "[f]oreign sovereign immunity, both under the common law and now under the FSIA, has always been a matter of grace and comity rather than a

matter of right under United States law." *Verlinden*, 461 U.S. at 486, 103 S.Ct. 1962, *citing Schooner Exchange v. M'Faddon*, 11 U.S. (7 Cranch) 116, 3 L.Ed. 287 (1812). Where neither the Constitution nor Congress grants a right, it is inappropriate to invent and perpetuate it by judicial fiat.

## V. Effect of International Agreements on the FSIA

 Defendants correctly argue that the FSIA must be interpreted subject to international agreements that were in existence at the time of the FSIA's enactment. Defendants argue that Plaintiff's claims are barred by Articles 21 and 26 of the Austrian State Treaty of 1955, 6 UST 2369, and The 1959 Austrian Exchange of Notes Constituting an Agreement Concerning the Settlement of Certain Claims under Article 26 of the Austrian State Treaty ("1959 Agreement").

Plaintiff correctly points out, however, that Article 21 of the 1955 Treaty, providing that Austria would not be required to make reparations for damages arising out of the existence of war after September 1, 1939, was an agreement that Austria need not make reparations to the Allied Forces. Other provisions of this Treaty concern themselves with Austria's responsibility regarding the return of property improperly seized from its citizens during the Nazi invasion.

The second paragraph of Article 26 concerns only heirless or unclaimed property. The paintings at issue are neither. The 1959 Agreement established a fund for settlement of certain enumerated claims, e.g., pensions, insurance policies, and bank accounts, but works of art were not among these enumerated claims. Moreover, the United States government explicitly reserved the right to pursue unknown claims.

Therefore, the existing international agreements at the time the FSIA was enacted do not require granting immunity to Austria as to Plaintiff's claims; in fact, these international agreements placed responsibility on Austria to return property that was improperly seized by the Nazis.

### IV. *Forum Non Conveniens*

Defendants argue that Plaintiff's claims should be dismissed under the doctrine of *forum non conveniens*. Plaintiff argues that this doctrine should not be applied because no reasonable alternative forum exists.

 Under the doctrine of *forum non conveniens*, a district court "may decline to exercise its jurisdiction, even though the court has jurisdiction and venue, when it appears that the convenience of the parties and the court and the interests of justice indicate that the action should be tried in another forum." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 250, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981). The party moving for dismissal under the doctrine of *forum non conveniens* must demonstrate the existence of an adequate alternative forum and that the balance of relevant private and public interest factors favor dismissal. *Creative Technology, Ltd. v. Aztech Sys. Pte, Ltd.*, 61 F.3d 696, 699 (9th Cir.1995). The existence of the availability of an adequate alternative forum is a threshold issue, and dismissal is not appropriate if such a forum is unavailable. *See id.* Even though a court may dismiss on *forum non conveniens* grounds when the foreign forum does not provide the same range of remedies as are available in the home forum, the alternative forum must provide some potential avenue for redress. *Ceramic Corp. of America v. Inka Maritime Corp.*, 1 F.3d 947, 949 (9th Cir.1993). A foreign forum is inadequate when it offers no remedy at all. *See, e.g., El–Fadl v. Central Bank of Jordan*, 75 F.3d 668, 677–78 (D.C.Cir.1996). Austria does not provide an adequate alternative forum to Plaintiff. Plaintiff's claims, if asserted in Austria, will most likely be barred by the statute of limitations of thirty years.[20] Because of California's "discovery rule" with regard to stolen works of art, and assuming as true the allegations in the Complaint, Plaintiff would not be barred on statute of limitations grounds in this forum.[21] If Plaintiff's claims are barred by the statute of limitations, she would be left without a remedy; clearly, therefore, Austria is not an adequate alternative forum for Plaintiff's claims.

Further, in this action for return of artwork valued at approximately $150 million, Austria's filing fees, even when reduced pursuant to Plaintiff's fee petition, also makes Austria an inadequate alternative forum. Austria's fee structure would require Plaintiff to pay the Austrian courts a

---

**20.** Defendants argue that the statute of limitations is tolled for fraudulent concealment. Significantly, however, Defendants have refused to waive their statute of limitations defense to Plaintiff's claims. Defendants rely on *Kilvert v. Tambrands, Inc.*, 906 F.Supp. 790 (S.D.N.Y.1995) in support of their motion to dismiss on *forum non conveniens* grounds; however, the *Kilvert* court dismissed the action only after the defendants agreed to waive their statute of limitations defense. Defendants' failure to agree to waive this defense is indicative of a belief that Plaintiff's claims are barred by the statute of limitations.

Defendants also argue that Plaintiff's claim under the 1998 law would not be barred based on the statute of limitations. However, Defendants' argument ignores the fact that the 1998 law created no private right of action. Defendants contend that regardless of whether the 1998 law created a private right of action, the Austrian Constitution permits a claim for the discriminatory application of this claim. However, that claim is not currently before the Court.

**21.** *See supra note* 10.

filing fee that approximates the sum total of her liquid assets. This amount varies between approximately \$130,000 to \$200,000, depending on the exchange rate. Additionally, in the event Plaintiff loses, Plaintiff would be required to pay costs, including attorney's fees, to the Republic and the Gallery.[22] A foreign forum's requirement that the plaintiff post a bond to proceed with litigation will generally not make the forum inadequate, unless the plaintiff is indigent or the excessively high amount of the bond makes it unduly burdensome. *See* 17 *Moore's Federal Practice,* § 111.74[2][d] (Matthew Bender 3d ed.); *see also Nai–Chao v. Boeing Co.,* 555 F.Supp. 9 (N.D.Cal.1982), *aff'd sub nom., Cheng v. Boeing Co.,* 708 F.2d 1406 (9th Cir.1983) (noting that filing fee did not automatically render foreign forum inadequate); *cert. denied,* 464 U.S. 1017, 104 S.Ct. 549, 78 L.Ed.2d 723 (1983).[23] Here, it is clear that Plaintiff is not indigent. Nevertheless, the Court finds that the filing fee required by the Austrian courts is oppressively burdensome. Paying even the reduced amount would force an 85–year–old woman to expend a great majority, if not all, of her liquid assets. Moreover, Austria has appealed the reduction in filing fees, and contends that Plaintiff should be required to pay an even greater amount.

For these reasons, Defendants have failed to demonstrate that Austria provides an adequate alternative forum and therefore the Court will not dismiss Plaintiff's claims under the doctrine of *forum non conveniens.*

---

**22.** Plaintiff would be unlikely to prevail in Austria, given the statute of limitations difficulties discussed above.

**23.** Defendants argue that *Cheng* requires dismissal of Plaintiff's claims. In *Cheng,* the district court held that a foreign forum was adequate for purposes of *forum non conveniens* analysis notwithstanding its burden-

## VII. Joinder of Necessary and Indispensable Parties

Defendants argue that the present action must be dismissed pursuant to Fed. R. Civ. P 19(a) because Plaintiff has failed to join necessary parties.

### A. Text of Rule 19(a)

Rule 19(a) provides:

(a) Persons to be Joined if Feasible. A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

Fed.R.Civ.P. 19(a).

Rule 19(a) provides three separate circumstances in which a person is to be considered a person to be joined if feasible (commonly referred to as "a necessary party"). First, a person is a necessary party if in the person's absence complete relief cannot be accorded among those already parties. Fed.R.Civ.P. 19(a)(1). The

---

some filing fees, so long as the filing fees were not oppressively burdensome. The Ninth Circuit found no abuse of discretion in the district court's conclusion, but did not separately consider the district court's holding with regard to the filing fee. Therefore, *Cheng* is not controlling authority on this issue.

second and third circumstances share a common preliminary requirement: The person must claim an interest relating to the subject of the action. Fed.R.Civ.P. 19(a)(2). The second circumstance in which a person is a necessary party is when the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may as a practical matter impair or impede the person's ability to protect that interest. Fed.R.Civ.P. 19(a)(2)(i). Third, a person is a necessary party if the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence leaves any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest. Fed. R.Civ.P. 19(a)(2)(ii). If any one of these three circumstances apply, the person is a necessary party. *Shimkus v. Gersten Cos.*, 816 F.2d 1318, 1322 (9th Cir.1987).

**B. Rule 19(a)(1)**

▬ The "complete relief" clause of Rule 19(a) addresses the interest in comprehensive resolution of a controversy and the desire to avoid multiple lawsuits regarding the same cause of action. *Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030, 1043 (9th Cir.1983), *cert. denied*, 464 U.S. 849, 104 S.Ct. 156, 78 L.Ed.2d 144 (1983). Nevertheless, this provision is concerned only with "relief as between the persons already parties, not as between a party and the absent person whose joinder is sought." *Eldredge v. Carpenters 46 N. Cal. Counties Jt. Apprenticeship and Training Comm.*, 662 F.2d 534, 537 (9th Cir.1981), *cert. denied*, 459 U.S. 917, 103 S.Ct. 231, 74 L.Ed.2d 183

(1982). The present action would resolve all claims between those already party to the present action; the presence of the other heirs is not required to fully adjudicate Plaintiff's claim to the paintings. This is so notwithstanding that others may assert an interest in the paintings as well.[24]

The Third Circuit has held that a party is not a necessary party based on the fact that the party might have a claim as to the property at issue in an *in rem* action. *Sindia Expedition, Inc. v. The Wrecked and Abandoned Vessel Known as the Sindia*, 895 F.2d 116 (1990) (holding that the state was not a necessary party in a controversy regarding a salvaged shipwrecked vessel based on state's assertion of ownership rights in the vessel and noting that "[t]he possibility that a successful party may have to defend its rights to the [vessel] in a subsequent suit brought by the State does not make [the state] a necessary party"). By the same token, that the absent parties here may later claim an interest in the subject of the action—the paintings—does not make them necessary parties.

The heirs are not necessary parties within the meaning Fed.R.Civ.P. 19(a)(1).

**C. Rule 19(a)(2)**

Under both clauses of Rule 19(a)(2), the absent party must claim an interest relating to the subject matter of the action. This interest may be a legally protected interest or an interest that "is to be determined from a practical perspective." *Aguilar v. Los Angeles County*, 751 F.2d 1089 (1985), *cert. denied*, 471 U.S. 1125, 105 S.Ct. 2656, 86 L.Ed.2d 273 (1985). The heirs undeniably have an interest relating to the subject matter of the action. This action seeks return of six paintings.

---

**24.** The heirs do not dispute the proportional share due to each of them; therefore, collectively, the heirs do not assert greater than a 100% interest in the paintings.

Among them, the heirs have a 100% interest in the paintings. Plaintiff claims only a subset of this interest—25%.

■ Nevertheless, the heirs do not "claim an interest" within the meaning of 19(a)(2). When persons are aware of an action but choose not to claim an interest by failing to join in the action, they are not considered necessary parties. *United States v. Bowen*, 172 F.3d 682, 689 (9th Cir.1999) (holding that the district court did not err by finding that a party who was aware of an action but chose not to claim an interest was not a necessary party under Rule 19). For this reason, the heirs are not persons who claim an interest in the action and are therefore not necessary parties under Fed. R. Civ. P 19(a)(2)(i) or (ii).

Even if this were not the case, however, the heirs would not be necessary parties under Rule 19(a)(2)(i) or (ii) for other reasons.

**D. Rule 19(a)(2)(i)**

■ The "impair or impede" clause of Rule 19(a)(2)(i) focuses on protecting the interest of the absent parties. Absent parties are not necessary parties if their interests are adequately represented by existing parties. *See, e.g., Washington v. Daley*, 173 F.3d 1158 (9th Cir.1999). In *Shermoen v. United States*, 982 F.2d 1312, 1318 (9th Cir.1992), *cert. denied*, 509 U.S. 903, 113 S.Ct. 2993, 125 L.Ed.2d 688 (1993), the Ninth Circuit considered three factors in determining whether an absent party would be adequately represented by existing parties.

■ First, the Court considers whether "the interests of a present party to the suit are such that it will undoubtedly make all" of the absent party's arguments. Here, the parties' claims to the paintings have the same genesis: All the heirs' claims to the paintings are based on their proportional inheritance (or their parent's proportional inheritance) of Ferdinand Bloch–Bauer's estate. The arguments supporting return of the paintings are common to all the heirs.

Next, the Court considers whether the party is "capable of and willing to make such arguments." The Court finds that Plaintiff is both capable of and willing to make all arguments in support of the heirs' claims. Plaintiff is aptly represented by counsel, and the heirs' interest is also partly advanced by amicus curiae Bet Tzedek.

Finally, the Court considers whether the absent party would "offer any necessary element to the proceedings" that the present parties would neglect to offer. Here, the absent parties would offer no additional element to the proceedings because, as explained above, the heirs' claims have a common genesis, and they have no disputes among themselves regarding the proportional interest of each.

Upon consideration of the factors enunciated by the Ninth Circuit, the Court finds that Plaintiff adequately represents the heirs' claims, and therefore, the heirs are not necessary parties under Rule 19(a)(2)(i).[25]

**E. Rule 19(a)(2)(ii)**

■ The "inconsistent obligations" clause of Rule 19(a)(2)(ii) focuses on the possibility that those already parties might be subjected to inconsistent obligations. This clause is concerned with inconsistent *obligations,* not inconsistent *adjudications.* 4 Moore's Federal Practice

---

**25.** Additionally, Plaintiff has received assignments of the rights to the paintings from three of the four other heirs. With these assignments, Plaintiff represents a 75% interest in the paintings.

§ 19.03[4][d] (Matthew Bender 3d ed.). An action that merely determines the ownership rights of property does not expose any party to inconsistent obligations, notwithstanding the possibility that another party might later claim an interest in that property. *Sindia Expedition,* 895 F.2d at 123.

## F. Defendant's Remaining Arguments

Defendants also argue that, generally, joint obligees are to be considered indispensable parties in an action to set aside a contract. (Plaintiff asks the court to rescind any agreement between the Gallery and the Austrian lawyer to exchange the paintings for export permits). Defendants rely on *Nike, Inc. v. Comercial Iberica De Exclusivas,* 20 F.3d 987, 991 (9th Cir. 1994), for this proposition. In *Nike,* the Ninth Circuit noted, in dicta, that generally joint obligees are indispensable parties to an action. In *Nike,* the joint obligees were a subsidiary and its parent, and the court held that a subsidiary's assignment of rights to a parent was a collusive attempt to maintain diversity jurisdiction because the subsidiary's presence in the suit would destroy diversity. These concerns are not present in this action.

The *Nike* court relied on an earlier Fifth Circuit case that is also cited by Defendants. In *Harrell and Sumner Contracting Co. v. Peabody Petersen Co.,* 546 F.2d 1227 (5th Cir.1977), the court noted the general rule that joint obligees are indispensable parties. The court's rationale, however, was based on the fact that the plaintiff and the party to be joined were joint venturers and that federal courts had held that all partners are indispensable parties in actions based on partnership contracts. Additionally, like the *Nike* court, the Fifth Circuit was concerned with the plaintiff's collusive attempt to invoke the court's diversity jurisdiction. The present case is distinguishable from *Harrell.* First, because no partnership is involved, the weight of authority regarding partnership agreements and indispensability of partners upon which the Fifth Circuit relied is inapplicable here. Second, there are no concerns with collusive attempts to invoke the Court's diversity jurisdiction because the action is properly before the Court on federal question jurisdiction. Third, there is ample reason for not applying the general rule in this action. As explained previously, the other heirs are aware of the action but have chosen not to participate and their interest will be adequately represented by Plaintiff. *Bowen,* 172 F.3d at 689; *Shermoen,* 982 F.2d at 1318. Therefore, *Harrell* is not persuasive authority on the issue of the indispensability of joint obligees.

Finally, Defendants rely on *Lomayaktewa v. Hathaway,* 520 F.2d 1324 (9th Cir. 1975), *cert. denied sub nom., Susenkewa v. Kleppe,* 425 U.S. 903, 96 S.Ct. 1492, 47 L.Ed.2d 752 (1976) for the proposition that in an action to set aside a contract, all parties who may be affected by the determination of the action are indispensable. In *Lomayaktewa,* the party held to be indispensable was the Hopi Tribe, which was the lessor of land in an action to void lease of land to coal mining company. In *Lomayaktewa,* the Plaintiff could not be joined because of sovereign immunity. Later Ninth Circuit authority, however, leads the Court to find that application of this general rule to the present circumstances is inappropriate.

Cases decided since *Lomayaktewa* have held that persons who do not join in an action despite knowing of the action do not claim an interest in the subject of the action and are therefore not necessary parties. *Bowen,* 172 F.3d at 689. Moreover, recent Ninth Circuit authority has also held that when, as here, the present parties will adequately represent the inter-

ests of the absent parties, the absent parties are not necessary parties. *Shermoen,* 982 F.2d at 1318. In the context of this action, these cases are more persuasive than a *per se* rule that joint obligees are always indispensable parties. This is especially so given the repeated instruction to district courts that Rule 19 is flexible and should be given practical application. *See, e.g., Provident Tradesmens Bank & Trust Co. v. Patterson,* 390 U.S. 102, 116 n. 12, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968); *Takeda v. Northwestern Nat'l Life Ins. Co.,* 765 F.2d 815, 819 (9th Cir.1985); *Eldredge,* 662 F.2d at 537.

Defendants also argue that another individual in Austria, a member of the Müller–Hofmann family ("Müller–Hofmann"), has made a claim for the portrait of Amalie Zuckerkandl, and that Müller–Hofmann is therefore a necessary party to this action. However, Müller–Hofmann asserts a claim to only one painting at issue in this action. Each cause of action in this action involves all six paintings. Therefore, having concluded that each cause of action is not subject to dismissal with regard to the remaining five paintings, and mindful that the Court may consider at any time in the proceedings whether the appropriate parties are joined,[26] the Court does not now consider whether Müller–Hofmann is a necessary party.

For these reasons, Plaintiff has not failed to join necessary parties and dismissal pursuant to Rule 19 is inappropriate; therefore, the Court denies Defendants Rule 12(b)(7) Motion to Dismiss for failure to join necessary parties.

## VIII. Venue

The FSIA has its own venue provision. 28 U.S.C. § 1391(f)(1)-(4). In relevant part, that provision states:

(f) A civil action against a foreign state as defined in section 1603(a) of this title may be brought (1) in any judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; ... (3) in any judicial district in which the agency or instrumentality is licensed to do business or is doing business, if the action is brought against an agency or instrumentality of a foreign state as defined in section 1603(b) of this title; or (4) in the United States District Court for the District of Columbia if the action is brought against a foreign state or political subdivision thereof.

*Id.*

Plaintiff argues that venue is proper under § 1391(f)(1) because a substantial part of the events or omissions giving rise to the claim occurred in the Central District because Austria has failed to deliver the paintings to her in Los Angeles. Defendants, however, correctly contend that the events or omissions giving rise to the claim occurred in Austria, where the paintings are located and where decisions determining the status and disposition of the paintings have been made. *See* 17 Moore's Federal Practice § 110.04[1] (Matthew Bender 3d ed.). Therefore, venue is not appropriate under § 1391(f)(1).

Plaintiff also contends that venue is proper under § 1391(f)(3) because Austria is doing business in the Central District. Defendants argue that the Gallery is not doing business in the Central Dis-

---

**26.** *See McCowen v. Jamieson,* 724 F.2d 1421, 1424 (9th Cir.1984) (holding that the issue of indispensability of parties may be raised at any time in the proceedings, even *sua sponte* and on appeal).

trict, and, in any event, the Gallery's activities do not establish that the Central District is a proper venue for claims against the Republic.

Unlike the other provisions of the FSIA that use the term "commercial activity," the FSIA's venue provision uses the term "doing business." The statutory scheme of the FSIA suggests that these terms, if not interchangeable, are at least substantially similar in meaning. The Court can find no authority that suggests that a foreign agency or instrumentality that engages in "commercial activity" within a district is not also "doing business" within a district. Therefore, venue is appropriate under § 1391(f)(3) because the Gallery engages in commercial activity in the Central District as explained in section III.F.4., *supra.*[27]

Defendants correctly argue that Plaintiff did not set forth § 1391(f)(3) as a basis for venue in the Complaint. Accordingly, Plaintiff is hereby **GRANTED** fifteen (15) days' leave to amend the Complaint to set forth the basis for venue pursuant to § 1391(f)(3).[28]

### IX. Conclusion

For the reasons stated herein, Defendant's Motion to Dismiss is **DENIED.**

Plaintiff is hereby **GRANTED** fifteen (15) days' leave to amend the Complaint to set forth the basis for venue pursuant to § 1391(f)(3).

■ The portion of this Order holding that the Court has subject matter jurisdiction because Austria is not entitled to sovereign immunity is immediately appealable pursuant to the collateral order doctrine. *Compania Mexicana De Aviacion, S.A. v. United States,* 859 F.2d 1354 (9th Cir. 1988). For this reason, the Court hereby certifies the remaining portions of this Order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).

---

27. Also as explained in section III.F.3., the Gallery's commercial activities establish jurisdiction over the Republic under § 1605(a)(3). When read in conjunction with § 1605(a)(3), it seems clear that venue is proper as to the foreign state under the FSIA "doing business" provision, § 1391(f)(3), if the agency or instrumentality engages in commercial activity within the district. This construction is supported by the FSIA's definition of "foreign state", which includes agencies and instrumentalities within the term, "foreign state." 28 U.S.C. § 1603(b).

28. This 15–day requirement will be stayed pending resolution of the interim appeal.